IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| David Mintjal and Therese Mintjal, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 08 cv 5681 |
| | ) | |
| v. | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| Professional Benefit Trust Multiple Employer Welfare Benefit Plan and Trust, PBT Administration, LLC, Professional Benefit Trust, Ltd. and Tracy Sunderlage, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO THE FIRST AMENDED COMPLAINT

Professional Benefit Trust Multiple Employer Welfare Benefit Plan and Trust, PBT Administration, LLC, Professional Benefit Trust, Ltd. and Tracy Sunderlage (collectively, "Defendants"), through their counsel respectfully submit this Answer and Affirmative Defenses to the First Amended Complaint ("Complaint") by David Mintjal and Therese Mintjal ("Plaintiffs"). In support thereof, Defendants state as follows:

### THE NATURE OF THE CASE

1. This action is brought pursuant to various provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The plaintiffs are employee participant beneficiaries in the "Professional Benefit Trust, Multiple Employer, Welfare Benefit Plan & Trust" a welfare plan within the meaning of ERISA Section 3(1). The Trust was marketed as one that complied with the requirements of the IRS Code section 419A(f)(6), thereby permitting the participating employers to deduct the payments to the Trust for welfare benefits provided on behalf of their employees.

**ANSWER:** Defendants deny that Plaintiffs are employee participant beneficiaries of the Professional Benefit Trust Multiple Employer Welfare Benefit Plan and Trust ("PBT Trust") for

the purposes of this lawsuit. Answering further, the PBT Trust was terminated effective October 31, 2006. Defendants admit the remaining allegations of this Paragraph 1.

## JURISDICTIONAL STATEMENT

2.  The Court has jurisdiction over the subject matter of this case pursuant to ERISA 502 (e)(1). Venue of this case is proper pursuant to ERISA Section 502 (e)(2).

**ANSWER:** Defendants admit the allegations of this Paragraph 2.

## COUNT I
### (Breach of Fiduciary Duty)

Now come the plaintiffs, Dave Mintjal and Therese Mintjal, pursuant to ERISA Sections 502(a)(2) and 502(a)(3), and for claim against the defendants and each of them, jointly severally or in the alternative, state as follows:

1-2. The plaintiffs repeat and re- alleges paragraphs 1 and 2 above as paragraphs 1 and 2 of this count.

**ANSWER:** Defendants repeat and incorporate by reference their answers to Paragraphs 1 and 2 above as if more fully set forth herein.

3.  The defendant, "Professional Benefit Trust, Multiple Employer Welfare Benefit Plan & Trust" (hereafter "Trust") is a Multiple Employer Welfare Benefit Plan & Trust within the meaning of ERISA Section 3(1).

**ANSWER:** Defendants admit that the Professional Benefit Trust Multiple Employer Welfare Benefit Plan and Trust was a welfare benefit plan within the meaning of ERISA Section 3(1) and was terminated effective October 31, 2006. The PBT Trust was governed and maintained pursuant to its plan documents and any amendments thereto. At the time of termination, the controlling plan document was the Professional Benefit Trust Fifth Amended and Restated Multiple Employer Welfare Benefit Plan and Trust ("Fifth Amended Trust"). Defendants deny the remaining allegations of this Paragraph 3.

4.  That the defendant, Professional Benefit Trust, Ltd., (hereafter, "PBT Ltd."), is a corporation that at all relevant times was the trustee of the Trust, and exercised discretionary authority and control over the plans, investments, and management of the Trust. PBT Ltd. was at all times

mentioned herein a fiduciary with respect to the Trust within the meaning of ERISA Section 3(21)(A).

**ANSWER:** Defendants admit that PBT Ltd. is a corporation, was a Trustee and a Named Fiduciary of the PBT Trust under the Fifth Amended Trust and within the meaning of ERISA, and exercised the authority and power as granted to it under the Fifth Amended Trust. Defendants deny the remaining allegations of this Paragraph 4.

5. That the defendant, Professional Benefit Trust Administration, LLC, (hereafter "PBT, LLC.") is a limited liability corporation that at all relevant times was the contract administrator for the Trust, and exercised discretionary authority and control over the plans, investments, and management of the Trust. PBT Administration was at all relevant times herein a fiduciary with respect to the Trust within the meaning of ERISA Section 3(21)(A).

**ANSWER:** Defendants admit that PBT LLC is a limited liability corporation, was a Contract Administrator and a Named Fiduciary under the Fifth Amended Trust and within the meaning of ERISA, and exercised the authority and power as granted to it under the Fifth Amended Trust. Defendants deny the remaining allegations of this Paragraph 5.

6. Tracy L. Sunderlage is a resident of the State of Illinois, and at all relevant times, on information and belief, owned, controlled, and was employed by PBT, Ltd. and PBT, LLC, and was a "defacto" plan sponsor, contract administrator, and trustee of the Trust. PBT, Ltd. and PBT, LLC, were alter ego's of Tracy Sunderlage. Tracy L. Sunderlage at all times exercised discretionary authority and control over the Trust and all plans, investments, and management of the Trust, and was a fiduciary with respect to the Trust within the meaning of ERISA Section 3 (21)(A).

**ANSWER:** Defendants admit that Tracy L. Sunderlage ("Sunderlage") is a citizen of the State of Illinois, that he was the Chief Executive Officer of PBT Ltd. and a Managing Member of PBT LLC. Defendants deny the remaining allegations of this Paragraph 6.

7. That prior to his involvement with the Trust, on information and belief, in 1986 Tracy L. Sunderlage was barred by the United States Securities and Exchange Commission from associating with any securities broker, dealer, investment adviser, investment company or municipal securities dealer as a result of claims of violations of the registration and anti fraud provisions of the United States Securities Act.

**ANSWER:** Defendants deny the allegations of this Paragraph 7.

8. That the Trust involves multiple employers and their employees as participants and beneficiaries of the Trust. The Trust provided employee welfare benefits to the employees of participating employers including death benefits and living benefits. The payments of death benefits due from the Trust were funded through insurance policies or reinsurance policies owned by the Trust.

**ANSWER:** The PBT Trust was initially established in Atlanta, Georgia in 1989 as Eagle Trust. It was subsequently renamed and relocated to Illinois. The PBT Trust provided specified employee welfare benefits, including death and living benefits, to the employee beneficiaries of participating employers, and was maintained pursuant to the controlling PBT Trust document. The final effective controlling document was the Fifth Amended Trust. The PBT Trust was established as a multiple-employer welfare benefit plan pursuant to § 419A(f)(6) of the Internal Revenue Code (the "IRC") and Regulations thereunder, and the laws of the island of Nevis of the West Indies. The PBT Trust was amended in accordance with its terms from time to time to conform to the IRC and Treasury Regulations governing § 419A(f)(6). A § 419A(f)(6) plan serves as the insurer of the contracted for benefits and provides the elected benefits to its insureds from its assets, which in turn, are accumulated by the plan through specified contributions of the participating employers. The contribution amounts are determined by the plan by reference to the premium cost necessary to reinsure the employee participant's death benefit through a commercial carrier. A common but not required method of reinsuring the risk was the purchase of an insurance policy on the participating employee's life which was owned by the plan. The PBT Trust owned all such insurance policies for its employee participants. At all times, the PBT Trust was solely responsible for the payment of all benefits, regardless of the value of any insurance or if the insurance company failed to pay on a policy for any reason. Defendants deny the remaining allegations of this Paragraph 8.

9. That General Produce Distributors, Inc., (hereafter "General Produce") is an Illinois Corporation with it's [sic] principal place of business in Franklin Park, Illinois. At all relevant times General Produce was an Employer who participated in the Trust since 1995 and

made annual contributions to said Trust for purposes of providing welfare benefits, including, death benefits and living benefits for it's [sic] participating employees, Plaintiffs, Dave Mintjal and Therese Mintjal, who were participant beneficiaries of the Trust. The death benefits to the employees of General Produce, were funded by four whole life insurance policies issued by Amerus Life Insurance Company (the "Amerus Policies"). At the inception of their involvement in the Trust, David Mintjal and Therese Mintjal, were each others designated death beneficiaries on these policies.

**ANSWER:** Defendants admit that General Produce is an Illinois corporation with its principal place of business in Franklin Park, Illinois, and that General Produce was a participating employer in the PBT Trust for the period 1995 through October 31, 2006. Defendants deny the remaining allegations of this Paragraph 9.

10. That plaintiff, David Mintjal, was, and is, employed by General Produce and is a participating employee and beneficiary of the Trust entitled to receive benefits under the terms of the Trust.

**ANSWER:** Defendants admit that David Mintjal is employed by General Produce and that for the period 1995 through October 31, 2006, Dave Mintjal was a participating employee of the PBT Trust and was entitled to receive benefits in accordance with the General Produce Adoption Agreement. Defendants deny the remaining allegations of this Paragraph 10.

11. That plaintiff, Therese Mintjal, was and is an employee of General Produce, and is a participating employee and beneficiary of the Trust entitled to receive benefits under the terms of the Trust.

**ANSWER:** Defendants admit that Therese Mintjal is employed by General Produce and that for the period 1995 through October 31, 2006, Therese Mintjal was a participating employee of the PBT Trust and was entitled to receive benefits in accordance with the General Produce Adoption Agreement. Defendants deny the remaining allegations of this Paragraph 11.

12. That at all relevant times herein the defendants, and each of them, were in fiduciary relationships with the plaintiffs as well as the other participants and beneficiaries of the Trust. As fiduciaries, the defendants, and each of them were charged under a ERISA Section 404 with discharging their duties solely in the interest of the plaintiff's and the other beneficiary members of the Trust, and:

    (A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii)defraying reasonable expenses of administering the plan;

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    **ANSWER:** Defendants deny the allegations of this Paragraph 12, including Subparts A-B.

    13.    The employers such as General Produce who participated in the Trust on behalf of their employees were billed annually for premiums due for Trust benefits. In addition, the Trust encouraged the participating employers to pay amounts in excess of the actual premiums due, in which event, the excess funds were held by the Trust and invested on behalf of the Trust beneficiaries. The cumulative amount of the employers contributions to the Trust assets were kept track of and accounted for by the Trust and reported to the Employer annually as that particular Employer's "beneficial interest" in the Trust assets.( hereafter "beneficial interest")[1]

    **ANSWER:** Defendants admit that employer participants were billed for premiums for their contractual benefits due under the PBT Trust. Defendants deny the remaining allegations of this Paragraph 13.

## THE IMPRUDENT INVESTMENTS

    14.    During 2004 and thereafter, the defendants purchased, with Trust assets, at least three investment products at a cost of approximately $9,335,132.00. The defendants represented that these investment products were, "Guaranteed Investment Contracts" (hereafter GICs) and "cash equivalents". A GIC is an investment product usually issued by a large insurance company. It pays an annual interest rate on the face amount of the GIC (usually the purchase price). At the end of the term the investor's principal is returned. The annual income payments and the return of the investor's principal at the end of the term are guaranteed by the issuing company.

---

[1] Over the years the total amount of the each employer's cumulative contributions and share of the Trust Assets has been identified and accounted for by the Trust by using various designations other than "Beneficial Interest". Other terms used were "Total Employer Funds", "Total Employer's Pro Rata Share", the "Employee Group's Pro Rata Share", and the "Employee's Group Asset". All these descriptions have been used to identify portions of each employers [sic] total cumulative contributions and beneficial interest in the assets being held by the Trust.
    **ANSWER:** Defendants admit the allegations of this Footnote 1. Answering further, these designations were required as the PBT Trust was amended from time to time to comply with IRC § 419(A)(f)(6).

**ANSWER:** Defendants admit that a GIC is an investment product usually issued by a large insurance company, typically it pays an annual interest rate on the face amount of the GIC (usually the purchase price), typically at the end of the term the investor's principal is returned, and typically the annual income payments and the return of the investor's principal at the end of the term are guaranteed by the issuing company. Defendants deny the remaining allegations of this Paragraph 14.

15. The three investment products known to have been purchased by the defendants and identified as GICs were as follows:

"Guaranteed Investment Contract" maturity date 12/31/06.   Cost: $3,335,132.00
"Guaranteed Investment Contract" maturity date 12/31/07.  Cost: $3,000,000.00
"Guaranteed Investment Contract" maturity date 06/30/14.  Cost: $3,000,000.00

**ANSWER:** Defendants deny the allegations of this Paragraph 15.

16. That the above investment products purchased by the defendants were, in fact, not "Guaranteed Investment Contracts", as represented by the defendants, but were, in fact, "Collateralized Debt Obligations" (hereafter "CDOs") purchased from off shore companies believed to be located somewhere in the Bahamas.

**ANSWER:** Defendants deny the allegations of this Paragraph 16.

17. A CDO is a totally different investment product than a GIC. A CDO is an unregulated type of security which is usually constructed from a portfolio of underlying income producing assets, such as mortgage loans or commercial loans. These assets are bundled together into different groups called tranches and sold to investors in varying amounts with a fixed annual interest rate paid over a fixed period of time. CDOs are exteremely complex investment products and are subject to significant risks of illiquidity and default due to their structure and the nature of the underlying assets funding the CDO. There is no established market for CDOs. Consequently market values and liquidity are unpredictable, as are the risks associated with the CDOs Neither the repayment of the principal nor the annual interest payments are guaranteed by the issuer of the CDO. Moreover, in most cases the underlying assets are not under the control of the purchaser of CDO and therefore not easily accessible to mitigate losses occasioned by a default.

**ANSWER:** Defendants admit that CDOs and GICs are complex investment products. Defendants deny the remaining allegations of this Paragraph 17.

18. That the purchase, and continued holding, of the CDOs by the Trust was clearly imprudent under the prevailing circumstances given the nature of the investments and the character and aims of the Trust.

**ANSWER:** Defendants deny the allegations of this Paragraph 18.

19. In addition, that the defendants failed to purchase any insurance or other financial product, to insure replacement of principal and interest payments of the CDOs in the event of default or devaluation.

**ANSWER:** Defendants deny the allegations of this Paragraph 19 and further deny that Defendants had any legal or other obligations as alleged.

20. That at least two of the known CDO investments are worthless and as a result the Trust and the Trust participants and beneficiaries, including the plaintiffs, sustained severe financial losses.

**ANSWER:** Defendants deny the allegations of this Paragraph 20.

21. That defendants concealed the true nature of these investments from plaintiffs and other participants in the Trust. Plaintiff first learned that the CDO's existed in January of 2008.

**ANSWER:** Defendants deny the allegations of this Paragraph 21.

## THE TERMINATION OF THE TRUST

22. That on information and belief during 2005 the Defendant Trust and PBT LLC. were being audited by the United States Internal Revenue Service as being the promoters of an abusive tax shelter under Internal Revenue Code section 6700.

**ANSWER:** Defendants deny the allegations of this Paragraph 22.

23. During 2005 or prior thereto the defendants determined that they were going to terminate the Trust. Without any amendment to the Trust Plan, the defendants, devised an elaborate termination plan which was designed to permit the defendants to terminate the Trust without the defendants relinquishing control over the exclusive management of over $70,000,000.00 in trust assets together with the management fees and other financial benefits associated therewith. The termination plan was designed to convert the IRS Code section 419A(f)(6) multiple employer trust into separate IRS Code section 419(e) individual trusts with the defendants serving as exclusive trustees, managers, and owners of the assets in the separate 419(e) trusts.

**ANSWER:** Defendants deny the allegations of this Paragraph 23.

24. As part of the termination plan, and without any amendment to the Trust, the defendants set up an offshore captive insurance company called "Maven Assurance Ltd" (hereafter "Maven") whose address is "P.O.Box 371" in Anguilla, in the British West Indies. The controlling ownership of Maven was never disclosed and is uncertain.

**ANSWER:** Defendants deny the allegations of this Paragraph 24.

25. As part of the termination plan, the defendants systematically withdrew 75 % of the cash surrender values of all the life insurance policies held for the beneficiaries in the Trust. On June 19, 2006 the defendants withdrew 75% of the cash surrender value of the Amerus Policies funding the plaintiffs' death benefits.

**ANSWER:** Defendants deny the allegations of this Paragraph 25.

26. As part of the termination plan the defendants systematically changed the names of the beneficiaries on all the life insurance policies held by the Trust. The defendants caused the "Professional Benefit Trust" to be substituted as the death benefit beneficiary on all the insurance policies thereby eliminating the names of the death beneficiaries that had been designated by the participant beneficiaries' [sic] of the Trust. On or about July 20, 2006 the defendants caused the names of the David Mintjal and Therese Mintjal to be removed as death beneficiaries on the Amerus Policies, and instead caused "PBT Trust" to be named as the sole beneficiary of said policies.

**ANSWER:** Defendants deny the allegations of this Paragraph 26.

27. As part of the termination plan on July 31, 2006 the defendants caused PBT. Ltd. to enter into an agreement with Maven Assurance Ltd.,(the offshore captive insurance company) as a result of which the Trust transferred ownership of approximately $70,000,000.00 in Trust assets to Maven, in the Bahamas, including the CDOs.

**ANSWER:** Defendants deny the allegations of this Paragraph 27.

28. As part of the termination plan, the defendants approved the payment of a $2,163,000.00 contingent fee to PBT, LLC.[sic]as compensation for services rendered to the Trust. Neither said fee, nor its manner of computation was disclosed to the Trust participants. On information and belief the fee was a contingent fee computed in part, on the value of the Trust's assets including the face value (purchase price) of the CDO's transferred by defendants to Maven which proved to be worthless.

**ANSWER:** Defendants admit that pursuant to the terms of the Fifth Amended Trust PBT LLC would receive compensation as the Contract Administrator upon the occurrence of certain events. Defendants deny the remaining allegations of this Paragraph 28.

29. As part of the agreement between the Trust and Maven, Maven set up "protected premium accounts" for each employer participant of the Trust. On information and belief, the amount that was credited to each employers "protected premium account" was to be equal to the amount of the respective employer's "beneficial interest".

**ANSWER:** Defendants deny the allegations of this Paragraph 29.

30. That the defendants terminated the Trust effective on or about 10/31/2006.

**ANSWER:** Defendants admit that in accordance with the terms of Fifth Amended Trust, PBT Trust terminated effective October 31, 2006. Defendants deny the remaining allegations of this Paragraph 30.

31. According to the Plan, upon termination of the trust, the employee participants, including the plaintiffs, were entitled to receive a "termination distribution" which consisted of their respective pro-rata share of the amount of their employer's "beneficial interest" in the Trust which had now been transferred to a "protected premium account" at Maven.

**ANSWER:** Defendants deny the allegations of this Paragraph 31.

32. At the time of termination of the Trust, the value of the plaintiffs' collective "beneficial interest" being held in the "protected premium account" at Maven was approximately $3,515,000.00. Plaintiffs were entitled to a "termination distribution" totaling that amount.

**ANSWER:** Defendants admit that in accordance with the terms of the Fifth Amended Trust, by Plaintiffs' elections and in accordance with the Automatic Welfare Benefit Plan Reinsurance Agreement Number 1 Between Professional Benefit Trust Ltd. and Maven Assurance Ltd., Plaintiffs' protected premium account was funded at no less than $3,515,000.00. Defendants deny the remaining allegations of this Paragraph 32.

33. Following termination of the Trust and as part of the defendants' termination plan, the defendants instructed the plaintiffs to replace their interest in the now terminated 419A(f)(6) multiple employer plan with a new 419(e) single employer plan. The defendants instructed the Mintjal plaintiffs to set up an annuity account with Acadia Life Limited and to use the Annuity to purchase "unregistered, non voting stock" in Maven. And to sign the necessary forms to authorize the defendants to transfer the plaintiffs' "beneficial interest" in the protected premium account at Maven to a new 419(e) plan, which would then be managed by the defendants.

**ANSWER:** Defendants deny the allegations of this Paragraph 33.

34. The plaintiffs set up an annuity with Acadia Life Limited (hereafter, "Acadia Annuity") in December of 2006, but did not sign the papers to join in the defendants' 419(e) plan.

**ANSWER:** Defendants admit that Plaintiffs set up the Acadia Annuity. Defendants deny the remaining allegations of this Paragraph 34.

35. Thereafter the defendants criticized the plaintiffs and their financial advisor for not enrolling in the defendants' 419(e) plan and continued to pressure plaintiffs to enroll in the defendants 419(e) plan, so the funds could be placed in an offshore investment portfolio

supervised by a man named Nicholas Batoo. (who, on information and belief, was selected by the defendants and is also known under the alias of "Nicholas Simon").

**ANSWER:** Defendants deny the allegations of this Paragraph 35.

36. The plaintiffs continued to refuse to enroll in the defendants [sic] 419(e) plan. The plaintiffs further demanded that the defendants and Maven pay the amounts due the plaintiffs to the plaintiffs [sic] annuity account at Acadia Life which had been set up by the plaintiffs to receive the funds.

**ANSWER:** Defendants deny the allegations of this Paragraph 36.

37. When the amount in the protected premium account was not paid, the plaintiffs were forced to engage counsel to assist them to recover the amounts they were due. On February 9, 2007, an attorney for the plaintiffs demanded the payments due from the defendants be made to the Acadia Annuity but was told that Maven Assurance Ltd. had not yet been approved by the Bahamian Insurance Regulators, and couldn't disburse the amounts attributed to the plaintiffs' premium protected account.

**ANSWER:** Defendants are without sufficient information to admit or deny allegations of this Paragraph 37 and therefore deny same.

38. Thereafter following further demands, the defendants caused a partial payment to be made from Maven to the plaintiffs' Acadia annuity in June of 2007. Almost eight months following termination of the Trust.

**ANSWER:** Defendants deny the allegations of this Paragraph 38.

39. The partial payment made to the plaintiffs annuity consisted of approximately $1,072,744.97 in cash plus a piece of paper purporting to be an assignment of shares in an entity described as "Concord Capital SPC". (Attached Exhibit "A")

**ANSWER:** Defendants admit the amount of $1,072,744.90 was distributed from Plaintiffs' Maven protected premium account to Plaintiffs' Acadia Life Policy in accordance with Plaintiffs' direction. Defendants deny that Exhibit A is attached to the Complaint. Defendants are without sufficient information to admit or deny the remaining allegations of this Paragraph 39 and therefore deny same.

40. That plaintiff was told by defendants that any additional funds owed to plaintiffs would be paid in 30 days.

**ANSWER:** Defendants deny the allegations of this Paragraph 40.

41. That the defendants and Maven informed the plaintiff that the "Concord Capital SPC" piece of paper delivered to the plaintiffs' Acadia Annuity was worth 1.7 million dollars and that the defendants and Maven were taking credit for that amount and deducting it from the amount due plaintiffs for their "beneficial interest" in the protected premium accounts.

**ANSWER:** Defendants deny the allegations of this Paragraph 41.

42. That the Concord Capital SPC piece of paper, on information and belief, relates to the CDOs that the defendants had previously purchased in 2004 and identified as a GIC.

**ANSWER:** Defendants deny the allegations of this Paragraph 42.

43. That the Concord Capital SPC piece of paper has no market value and is illiquid and virtually worthless.

**ANSWER:** Defendants are without sufficient information to admit or deny the allegations of this Paragraph 43 and therefore deny same.

44. That the plaintiffs have been deprived of their right under the Trust Plan and the Termination Plan to receive the full amount due them for the beneficial interest in the Trust held in the protected premium account, and therefore have sustained damage in an amount in excess of 1.7 million dollars plus costs and interest on said amount since the date the Trust was terminated in 10/31/06.

**ANSWER:** Defendants deny the allegations of this Paragraph 44.

45. That on information and belief the plaintiffs believe that other participant beneficiaries in the Trust have also been deprived of their beneficial interests in the Trust held in the protected premium accounts by the defendants and Maven who substituted paper assignments of various worthless CDOs as a parts of the other Trust participant beneficiaries' "beneficial interests" held, in "premium protected accounts".

**ANSWER:** Defendants deny the allegations of this Paragraph 45.

46. That on information and belief the defendants favored some Trust participants over others in connection with the termination of the Trust and improperly and unfairly allocated Trust assets to the "premium protected accounts" at Maven, or were otherwise unfair in their treatment of the Trust participants in connection with the termination of the Trust.

**ANSWER:** Defendants deny the allegations of this Paragraph 46.

47. That the defendants have also failed to account for the balance of the trust assets remaining in the Trust following the termination of the Trust and have failed to file a form 5500 with the United States Department of Labor for the year ending 12/31/2007 and thereafter.

**ANSWER:** Defendants deny the allegations of this Paragraph 47.

48. That the defendants, and each of them, have been and continue to be guilty of violating their fiduciary duties to the employee participant beneficiaries of the Trust, including the plaintiffs, under the provisions ERISA, Sections 404, 405, 406 and 407 in one or more of the following regards:

    a. Imprudently invested $10,000,000.00 of Trust assets in illiquid and risky CDOs.

    b. Imprudently failed to secure insurance or other available risk protection products to protect the Trust from loss of the Trust Assets invested in the CDO's.

    c. Misrepresented the nature of the CDO investments as "guaranteed investment contracts".

    d. Failed to divest itself of the CDOs at a time when damage to the Trust could have been avoided or mitigated.

    e. Took and approved a contingent fee of at least $2,163,000.00 without disclosing that fee arrangement or the manner of its computation to the participants in the Trust.

    f. Improperly computed and approved compensation to the Trustee and Administrator.

    g. Took cash assets from the Trust to pay defendants $2,163,000.00 dollars placing defendants interests ahead of the participants when their were inadequate assets to pay the participants their respective "beneficial interests" in the Trust.

    h. Imprudently and without proper authority created an unnecessary offshore captive insurance company called Maven and transferred over $70,000,000.00 in Trust assets to Maven, an offshore company, beyond the jurisdiction of the United States.

    i. Used the Trust fund as a source of personal loans believed to be in excess of $250,000.00.

    j. Made management and investment decisions for the Trust while in a conflict of interests with the Trust beneficiaries and the interests of the Trust.

    k. Failed to account to the participant beneficiaries for the distribution of all the Trust assets subsequent to termination of the Trust.

    l. On information and belief, engaged in prohibited transaction with businesses owned or controlled by Tracy L. Sunderlage, or his family members in violation of ERISA Section 406.

    m. Failed to make timely and complete distributions of the amounts due to the Trust participants upon termination of the Trust.

      n.      Failed to disclose to the participants of the Trust that the Securities and Exchange Commission had sanctioned him for violating the antifraud provisions of the Securities Act prior to soliciting their participation in the Trust.

      o.      Failed to file form 5500 with the U.S. Department of Labor for the year ending 12/31/2007 and thereafter.

      p.      Improperly delegated their duties involving management of the Trust and the Trust assets to Maven.

      q.      Failed to operate the Trust and manage Trust assets and discharge their fiduciary duties in the sole interests of the beneficiaries.

      **ANSWER:** Defendants deny the allegations of this Paragraph 48, including Subparts a-q.

      49.      That the defendants, and each of them, had knowledge of the foregoing breaches of fiduciary duty and failed to take any action to prevent or correct said breaches and acted jointly and in concert with respect to said breaches.

      **ANSWER:** Defendants deny the allegations of this Paragraph 49.

      50.      That as a direct and proximate result of the defendants breaches of fiduciary duty, the Trust sustained damages in an amount in excess of $12,000,000.00 plus lost interest on the GIC/CDO investments.

      **ANSWER:** Defendants deny the allegations of this Paragraph 50.

      WHEREFORE, the plaintiffs pray for the following relief:

      a) That the Court enter judgment in favor of the Trust, or the Trust participants, jointly and severally in an amount in excess of $12,000,000.00, or such other amount as is found to be due for losses and damages to the Trust Fund proximately caused by the defendants breaches of fiduciary duty, and that the defendants be ordered to restore said .amounts to the Trust.

      b) That the Court Order the defendants to restore or replace to the Trust the $70,000,000.00 in Trust assets transferred to Maven together with the costs and expenses associated with Maven's creation, or in the alternative, enter judgment against the defendants jointly and severally for such amounts.

      c) Remove the defendants from their positions as fiduciaries of the Trust and terminate the defendants further involvement in the management of the Trust or its assets.

      d) Direct the defendants to disgorge, and restore to the Trust any fees paid to themselves, or any of them, for services rendered which are found to have been improperly paid or incorrectly computed.

e) That the Court declare that the conduct of the defendants in establishing Maven and transferring all Trust property offshore was illegal and violated the defendants authority under the Trust Plan.

f) That the Court award the plaintiffs equitable relief in the form of restitution for 1.7 million dollars they have been deprived by reason of the defendants violations of their fiduciary duties, or and for a constructive trust on any assets remaining in the Trust, or restored to the Trust, to replace to replace the worthless Concord Capital SPC paper that was distributed to the plaintiff by the defendants as a result of defendants violations of their fiduciary duties.

g) For such other equitable relief that the court determines that the plaintiffs are entitled to for recovery of sums they have been deprived of by the defendants wrongful conduct.

h) For reasonable attorneys [sic] fee and costs.

**ANSWER:** Defendants deny the allegations of the unnumbered "Wherefore" Paragraph of the Complaint, whether express or implied. Answering further, Defendants deny that Plaintiffs are entitled to the relief requested and deny that Plaintiffs are entitled to any relief of any nature whatsoever.

## COUNT II
### (Failure to Produce Requested Documents)

Now comes the plaintiffs pursuant to ERISA Section 502(a)(1)(A) and for claim against the defendants PBT, Ltd. and PBT, LLC. states as follows:

1-13. Plaintiffs repeat and re-allege paragraphs 1-13 of Count I as paragraphs 1 through 13 of this Count.

**ANSWER:** Defendants repeat and incorporate by reference their answers to Paragraphs 1-13 of Count I above as if more fully set forth herein as their answer to this Paragraph 1-13 of Count II.

14. That on or about June 20, 2008 the plaintiffs requested information and various documents under which the plan is established and operated, from defendants PBT Ltd., and PBT, LLC., the plan Administrator. (see Exhibit B)

**ANSWER:** Defendants deny that Exhibit B is attached to the Complaint. Defendants deny the remaining allegations of this Paragraph 14.

15. That the defendants, PBT, LLC., the Plan Administrator, has failed to produce the documents requested within the times required by ERISA Section 502 (c)(2) failure to produce the

requested documents is also a violation of the defendants [sic] fiduciary duties under ERISA Section 404.

**ANSWER:** Defendants deny the allegation of this Paragraph 15.

WHEREFORE, the Plaintiff prays for the following relief:

1. That the Court order the defendant, PBT, LLC., to furnish the requested documents.

2. That the Court assess fines and penalties against the, PBT, LLC. pursuant to ERISA Section 502(c).

3. For whatever other relief the Court deems appropriate under the circumstances.

**ANSWER:** Defendants deny the allegations of the unnumbered "Wherefore" Paragraph of the Complaint, whether express or implied. Answering further, Defendants deny that Plaintiffs are entitled to the relief requested and deny that Plaintiffs are entitled to any relief of any nature whatsoever.

Plaintiff demands trial by jury where allowed by law or equity

**ANSWER:** Defendants deny that Plaintiffs are entitled to a jury trial for any claims alleged in the Complaint.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

For their additional and affirmative defenses Defendants state as follows:

1. Defendant Professional Benefit Trust Multiple Welfare Benefit Plan and Trust is not a proper party. Plaintiffs purport to bring Count I pursuant to ERISA Sections 502(a)(2) and 502(a)(3) on behalf of the PBT Trust. The PBT Trust cannot be named as a defendant in a suit in which it is considered to be the plaintiff.

2. Defendants do not have control over any assets outside of the PBT Trust.

3. Plaintiffs are not legally or factually entitled to the relief claimed in Count I.

4. Plaintiffs are not legally or factually entitled to the relief claimed in Count II.

5. The Plaintiffs do not have standing because they are not ERISA participants or beneficiaries.

6. The PBT Trust terminated October 31, 2006.

7. The termination payment alleged by the Plaintiffs is not a benefit under ERISA or the Fifth Amended Plan.

8. The Plaintiffs have not incurred damages and therefore do not have standing.

9. The Plaintiffs do not have standing because they have not suffered any damages and received any and all benefits under the PBT Trust.

9. Any and all actions by each or any of the Defendants with respect to the Plaintiffs and their participation in the PBT Trust were done at the direction of General Produce Distributors, Inc., and their and its agents, Tony Fiorello and James Paserrelli.

10. The Plaintiffs have failed to mitigate their damages, if any.

11. There is no right of jury trial for any of the claims alleged in the Complaint.

WHEREFORE, Defendants respectfully request that this Court deny the relief sought by Plaintiffs in the Complaint, and enter judgment in their favor and against Plaintiffs and grant such other relief as is necessary and proper, including all attorneys' fees and costs incurred.

Dated: September 25, 2009

Respectfully submitted,

Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust, PBT Administration, LLC, Professional Benefit Trust, Ltd. and Tracy Sunderlage

By: /s/ Cheryl Tama Oblander
One of Their Attorneys

Cheryl Tama Oblander
Nathan D. Larsen
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street
Suite 1800
Chicago, IL 60602
312-444-9660
ctama@butlerrubin.com
nlarsen@butlerrubin.com


446758v2

## CERTIFICATE OF SERVICE

      The undersigned, counsel for Defendants, hereby certifies that on September 25, 2009, a true and correct copy of the foregoing **Defendants' Answer and Affirmative Defenses to the First Amended Complaint** was filed electronically with the Court. Notice of this filing will be sent to the parties below by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

William F. Fitzpatrick
Fitzpatrick & Harrop, Ltd.
36 W. Randolph Street
Suite 301
Chicago, IL 60601
phone 312-553-2200
fax 312-553-2217
williamfitz@netzero.com

/s/ Nathan D. Larsen
Nathan D. Larsen

447496v1