## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| David Mintjal, and Therese Mintjal      ) | |
|            ) | |
|       Plaintiffs     ) | |
|            ) | |
|     vs.       ) | No.: 08 C 5681 |

David Mintjal, and Therese Mintjal )
                  )
      Plaintiffs        )
                  )
    vs.             )      No.: 08 C 5681
                  )
Professional Benefit Trust, Multiple )
Employer Welfare Benefit Plan & Trust, )
PBT Administration, LLC, and Professional )
Benefit Trust, Ltd., Tracy Sunderlage, )
Linda Sunderlage, Maven Assurance, Ltd. )
Sunderlage Resource Group, Inc. )
SRG International Inc., )
                  )
      Defendants     )

## AMENDED ANSWER TO SECOND AMENDED COMPLAINT

Defendants Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust, PBT Administration, LLC, Professional Benefit Trust, Ltd., Tracy Sunderlage, Linda Sunderlage, Maven Assurance, Ltd and Sunderlage Resource Group, Inc., by and through counsel, hereby respond to the allegations of Plaintiffs' Second Amended Complaint as follows.

### NATURE OF THE CASE

1.     This action is brought pursuant to various provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The plaintiffs are employee participant beneficiaries in the "Professional Benefit Trust, Multiple Employer, Welfare Benefit Plan & Trust", a multiple employer welfare benefit plan within the meaning of ERISA Section 3 (1) (hereafter the "Trust" or the "419A(f)(6),Trust"), who bring this action individually, and also in a derivative capacity on behalf of the Trust and its participants pursuant to ERISA Sections 502(a)(2) and 502(a)(3). The Trust was marketed as one that complied with the requirements of the IRS Code section 419A(f)(6), thereby permitting the participating employers to deduct the payments to the Trust for welfare benefits provided on behalf of their employees who were beneficiaries of the Trust. This action is not a collusive one to confer jurisdiction on a Court of the United States which it would not otherwise have.

1

**ANSWER:**    Defendants deny that Plaintiffs are employee participant beneficiaries of the Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust ("PBT Trust") for the purposes of this lawsuit.   Defendants further deny that plaintiffs may maintain this action derivatively on behalf of PBT Trust and its participants.  Defendants affirmatively state that the PBT Trust was terminated effective October 31, 2006.   Defendants admit the remaining allegations in Paragraph 1.

## JURISDICTIONAL STATEMENT

2.    The Court has jurisdiction over the subject matter of this case pursuant to ERISA 502 (e) (1). Venue of this case is proper pursuant to ERISA Section 502 (e)(2).

**ANSWER:**    Paragraph 2 contains legal allegations that require no response.  To the extent a response is required, Defendants admit the allegations in Paragraph 2.

## COUNT I

### (Breach of Fiduciary Duty, improper termination of the Trust by transferring all Trust Assets offshore to Maven Assurance Ltd)

Now come the plaintiffs, Dave Mintjal and Therese Mintjal, individually, and in a derivative capacity on behalf of the Trust and its participants and beneficiaries pursuant to ERISA Sections 502(a)(2) and 502(a)(3), and for claim against the defendants Tracy Sunderlage, Linda Sunderlage, Professional Benefit Trust Ltd. and PBT Administration LLC (hereafter, collectively referred to as "fiduciary defendants")  and each of them, jointly severally or in the alternative, state as follows:

1-2.    The plaintiffs repeat and re- alleges paragraphs 1 and 2 above as paragraphs 1 and 2 of this count.

**ANSWER:**    Defendants incorporate their response to paragraphs 1 and 2 above as their response to paragraph 1-2 of Count I.  Defendants further deny that plaintiffs have standing to bring claims on behalf of the Trust, its participants or its beneficiaries.

-2-

3.    The defendant, "Professional Benefit Trust, Multiple Employer Welfare Benefit Plan & Trust" (hereafter "Trust" or "PBT Trust") is a Multiple Employer Welfare Benefit Plan & Trust within the meaning of ERISA Section 3(1).

**ANSWER:**    Defendants admit the allegations in Paragraph 3, and affirmatively state that the PBT Trust was terminated effective October 31, 2006. The PBT Trust was governed and maintained pursuant to its plan documents and any amendments thereto. At the time of termination, the controlling document was the Professional Benefit Trust Fifth Amended and Restated Multiple Employer Welfare Benefit Plan and Trust ("Fifth Amended Trust").

4.    That the defendant, Professional Benefit Trust, Ltd., (hereafter, "PBT Ltd."), is an offshore corporation organized under the laws of Nevis in the West Indies and is wholly owned and controlled by Tracy Sunderlage. At all relevant times herein PBT Ltd. was the trustee of the Trust, and exercised discretionary authority and control over the Trust's, investments, and the management of the Trust and its assets. PBT Ltd. was at all times mentioned herein a fiduciary with respect to the Trust within the meaning of ERISA Section 3(21)(A).

**ANSWER:**    Defendants admit that PBT, Ltd. was organized under the laws of Nevis, West Indies, was wholly owned by Tracy Sunderlage, was a Co-Trustee from 2000 to 2006 and a Named Fiduciary of the PBT Trust under the Fifth Amended Trust and within the meaning of ERISA, and exercised the authority and powers granted to it under the Fifth Amended Trust. Defendants deny all remaining allegations in Paragraph 4.

5.    That the defendant, Professional Benefit Trust Administration, LLC, (hereafter "PBT, LLC.") is an Illinois limited liability company which was, at all relevant times, owned and controlled by Tracy Sunderlage it managing member. At all relevant times herein, PBT, LLC was the contract administrator for the Trust, and exercised discretionary authority and control over the Trust's investments, and the management of the Trust. PBT, LLC was at all relevant times herein a fiduciary with respect to the Trust within the meaning of ERISA Section 3(21)(A).

**ANSWER:**    Defendants admit that PBT, LLC was an Illinois limited liability company owned in part by its managing member, Tracy Sunderlage. Defendants further admit that PBT, LLC was a Contract Administrator from 1995 to 2006 and a Named Fiduciary under the Fifth Amended Trust and within the meaning of ERISA, and exercised the authority and power as

-3-

granted to it under the Fifth Amended Trust. Defendants deny the remaining allegations of this Paragraph 5.

6.     Tracy L. Sunderlage (hereafter "Sunderlage" is a resident of the State of Illinois, and at all relevant times, owned, controlled, and operated PBT, Ltd. and PBT, LLC, and was a "defacto" plan sponsor, contract administrator, and trustee of the Trust.    PBT, Ltd. and PBT, LLC, were alter egos of Tracy Sunderlage.   Tracy L. Sunderlage at all times herein provided services to the Trust and exercised discretionary authority and control over the Trust's investments, and the management of the Trust, and was a fiduciary with respect to the Trust within the meaning of ERISA Section 3 (21)(A).

**ANSWER:**     Defendants admit that Tracy L. Sunderlage ("Sunderlage") is a citizen of the State of Illinois, that he was the Chief Executive Officer of PBT Ltd. and a Managing Member of PBT LLC. Defendants deny the remaining allegations of this Paragraph 6.

7.     That Linda Sunderlage is a resident of the State of Illinois, and at all relevant times was the wife and business partner of Tracy Sunderlage.  Linda Sunderlage was a fiduciary of the Trust within the meaning of ERISA Section 3 (21)(A) in that she exercised discretionary authority and control over the management of the Trust. She maintained the corporate books and records of the Trust, and participated in the decision making processes of the Trust and its other fiduciaries in conducting the operations of the Trust.She had full authority and control over the cash accounts and other assets of the Trust, and authority and responsibility regarding the disbursement of Trust's funds and assets, including, authority to write checks, endorse checks, deposit and withdraw Trust funds, and make and receive wire transfers of Trust funds.

**ANSWER:**     Defendants admit that Linda Sunderlage ("Linda") is a resident of the State of Illinois, the wife of Sunderlage, and at times worked for or with Sunderlage in his businesses. Defendants further admit that Linda helped maintain the books and records of various companies and had authority to sign checks for those companies.   Defendants deny the remaining allegations in Paragraph 7.

8.     That defendants Tracy Sunderlage, PBT Ltd., PBT, LLC., and Linda Sunderlage, (Hereafter, collectively referred to as the "fiduciary defendants") and each of them, at all times mentioned herein, had knowledge of,  and knowingly participated in, their own, and each others breaches of fiduciary duty and other wrongful  conduct, as alleged herein, within the meaning of 29 U.S.C. 1105, and further knowingly aided and abetted each other with respect to the commission of the wrongful conduct alleged herein.

**ANSWER:**    Defendants deny the allegations in Paragraph 8.

9.    That at all times mentioned herein, Tracy Sunderlage was in complete control of the activity and conduct of the defendants, PBT Ltd and PBT, LLC, and, there existed a unity of interest and ownership between Sunderlage and said defendants to the extent that there was no distinction between said defendants and Sunderlage. Sunderlage used both PBT Ltd and PBT LLC interchangeably to carry out his own interests and the business of the Trust. Sunderlage operated PBT Ltd and PBT LLC using the same letterhead, the same phone numbers, and the same addresses, and the same staff. Neither of said defendants were adequately capitalized and neither would be able to satisfy any judgment rendered against them herein. Neither, PBT, Ltd. or PBT, LLC, paid adequate heed to corporate formalities, such as holding regular shareholders meetings or regular meetings for the election of officers and directors. The officers and directors of said defendants were designated by Sunderlage as needed. Both corporate defendants failed to generate and maintain proper corporate records and resolution books. Both corporate defendants were mere facades for the operations of Sunderlage, the dominant shareholder. Adherence to the fiction that said corporations had a separate existence would promote injustice or inequitable consequences in this case and the court should pierce the corporate veil of the said corporate defendants so that any judgments entered against them should also be entered against Sunderlage personally.

**ANSWER:**    Defendants admit that certain individuals provided services to both PBT, Ltd. and to PBT, LLC. The remaining allegations are legal conclusions that require no response. To the extent a response is required, defendants deny the remaining allegations in Paragraph 9. Defendants additionally state that the Plaintiffs have copies of detailed books and records, which make the assertion of these allegations knowingly false.

10.    That at all relevant times herein, Tracy L. Sunderlage was subject to a permanent injunction issued by the United States District Court for the Northern District of Illinois, enjoining Sunderlage, and any one acting in concert with him, from engaging in fraud or deceit in connection with the sale of securities, and from acting as an investment advisor without being registered with the SEC. The permanent injunction was issued as a result of a suit brought against Sunderlage by the SEC alleging that Sunderlage violated the anti fraud and registration provisions of the United States Securities Act of 1933 by employing a scheme to defraud investors in connection with the sale of unregistered securities.

**ANSWER:**    Defendants admit that Sunderlage stipulated to the entry of the referenced injunction, with no admission of liability, resulting in a two-year suspension of Sunderlage's Series 7 license only. Defendants further respond that the document speaks for itself.

11.     That the Trust involves multiple participating employers whose employees are beneficiaries of the Trust. The employers made annual contributions to the Trust for their respective employees. The Trust then provided various employee welfare benefits to the employees of the participating employers including death benefits and living benefits which were described in a "Certificates of Coverage" issued by the Trust. The payments of death benefits due from the Trust were at times funded by commercial insurance policies owned by the Trust.

**ANSWER:**     The PBT Trust was initially established in Atlanta, Georgia in 1989 as Eagle Trust. It was subsequently renamed and relocated to Illinois. The PBT Trust provided specified employee welfare benefits, including death and living benefits, to the employee beneficiaries of participating employers, and was maintained pursuant to the controlling PBT Trust document. The final effective controlling document was the Fifth Amended Trust. The PBT Trust was established as a multiple-employer welfare benefit plan pursuant to § 419A(f)(6) of the Internal Revenue Code (the "IRC") and Regulations thereunder, and the laws of the island of Nevis of the West Indies. The PBT Trust was amended in accordance with its terms from time to time to conform to the IRC and Treasury Regulations governing § 419A(f)(6). A § 419A(f)(6) plan serves as the insurer of the contracted for benefits and provides the elected benefits to its insureds from its assets, which in turn, are accumulated by the plan through specified contributions of the participating employers. The contribution amounts are determined by the plan by reference to the premium cost necessary to reinsure the employee participant's death benefit through a commercial carrier. A common but not required method of reinsuring the risk was the purchase of an insurance policy on the participating employee's life which was owned by the plan. The PBT Trust owned all such insurance policies for its employee participants. At all relevant times, the PBT Trust was solely responsible for the payment of all benefits, regardless of the value of any insurance or if the insurance company failed to pay on a policy for any reason. Defendants deny the remaining allegations of this Paragraph 11.

12.     That at all the relevant times herein the Trust was required to be administered according to a plan document known as "The Professional Benefit Trust Fifth Amended And Restated Multiple Employer Welfare Benefit Plan And Trust" (hereafter, the "Trust Plan").

**ANSWER:**     Defendants admit the allegations contained in Paragraph 12.

13.     That at all times mentioned herein the fiduciary defendants had a fiduciary duty to administer the Trust according to the Trust Plan for the exclusive benefit of all the participating employees and beneficiaries of the Trust.

**ANSWER:**     Defendants deny the allegations in Paragraph 13.

14.     Under the Trust Plan all contributions made by the Employer participants in the Trust were to be held in trust for the benefit of the participating employees in the Trust including the plaintiffs.

**ANSWER:**     Defendants admit the allegations in Paragraph 14.

15.     That General Produce Distributors, Inc., (hereafter "General Produce") is an Illinois Corporation with its principal place of business in Franklin Park, Illinois. At all relevant times General Produce was an Employer who participated in the Trust since 1995 and made annual contributions to said Trust for purposes of providing welfare benefits, for its participating employees, Plaintiffs, Dave Mintjal and Therese Mintjal, who at all times herein were employee beneficiaries of the Trust. The death benefits provided by the Trust to the plaintiffs were initially funded by four whole life insurance policies having a cash value and issued by Amerus Life Insurance Company (the "Amerus Policies"). At the inception of their involvement as beneficiaries of the Trust, David Mintjal and Therese Mintjal, were named as the designated death beneficiaries on these policies.

**ANSWER:**     Upon information and belief, defendants admit that General Produce is an Illinois corporation with its principal place of business in Franklin Park, Illinois, that it was a participating employer in the PBT Trust from 1995 through October 31, 2006, and that the Mintjals were initially designated as beneficiaries on the Amerus Policies. From 1995 to 1997, the Trust was designated as a co-beneficiary, and from 1997 to 2006, was the sole beneficiary. Defendants further admit that from 1995 through October 31, 2006, the Mintjals were participating employees of the PBT Trust and were entitled to receive benefits in accordance

with the General Produce Adoption Agreement. Defendants deny the remaining allegations in Paragraph 15.

16.     That plaintiff, David Mintjal, was, and is, employed by General Produce and at all relevant times was a participating employee and beneficiary of the Trust entitled to receive benefits and distributions conferred on the employee participants by the Trust and the Trust Plan.

**ANSWER:**     Defendants admit that David Mintjal is employed by General Produce and that for the period 1995 through October 31, 2006, he was a participating employee of the PBT Trust and was entitled to receive benefits in accordance with the General Produce Adoption Agreement. Defendants deny the remaining allegations of this Paragraph 16.

17.     That plaintiff, Therese Mintjal, was, and is, employed by General Produce and at all relevant times was a participating employee and beneficiary of the Trust entitled to receive benefits and distributions conferred on the employee participants by the Trust and the Trust Plan.

**ANSWER:**     Defendants admit that Therese Mintjal is employed by General Produce and that for the period 1995 through October 31, 2006, she was a participating employee of the PBT Trust and was entitled to receive benefits in accordance with the General Produce Adoption Agreement. Defendants deny the remaining allegations of this Paragraph 17.

18.     That the fiduciary defendants, and each of them, were in fiduciary relationships with the Trust, and the participants and employee beneficiaries of the Trust, including the plaintiffs. The fiduciary defendants, and each of them, were charged under an ERISA Section 404 with discharging their duties solely in the interest of the employee beneficiaries of the Trust, and:

(A)     for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii)defraying reasonable expenses of administering the plan; and

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER:**     Defendants deny the allegations in Paragraph 18.

19.     The employer participants in Trust, such as General Produce, were billed annually by the Trust for premiums due for Trust benefits for their respective employees. All funds paid

by participating employers to the Trust were held in the Trust and invested on behalf of, and for the benefit of the Trust employee beneficiaries, The cumulative amount of the contributions to the Trust assets paid by each employer was kept track of and accounted for by the Trust and such amount was reported to the Employer annually as that particular Employer's "beneficial interest" in the Trust assets, which said amounts where to held in Trust for the benefit of the employee beneficiaries of the Trust. (Hereafter "beneficial interest") [1]

**ANSWER:**  Defendants deny the allegations in Paragraph 19, and specifically state that each

employer's beneficial interest was determined by plan auditors, not by the Defendants, as of

December 31 each year. Defendants did not determine the employers' beneficial interest, which

was not equal to the amount of their contributions.

20.    Section 13.3 of the Trust Plan required that if the Trust was to be terminated the employee beneficiaries of the Trust be paid "termination distributions". The amount of the termination distributions paid to an employer participant's employees was approximately equal to that employer's cumulative "beneficial interest".

**ANSWER:**  Paragraph 20 contains legal conclusions that require no response. To the extent a

response is required, defendants deny the allegations in Paragraph 20, and further state that the

primary purpose of the Trust was to provide welfare benefits, not distributions.

21.    That, on information and belief, starting in during 2005, the fiduciary defendants, or, some of them, were being investigated by the United States Internal Revenue Service for being the promoters of an abusive tax shelter under Internal Revenue Code section 6700.

**ANSWER:**  Defendants admit that an audit was started in or about 2004, but it was

immediately suspended because of a request for a Private Letter Ruling. When the private letter

---

[1]    Over the years the total amount of the each employer's cumulative contributions and share of the Trust Assets has been identified and accounted for by the Trust by using various designations other than "Beneficial Interest". Other terms used were "Total Employer Funds", "Total Employer's Pro Rata Share", the "Employee Group's Pro Rata Share", and the "Employee's Group Asset". All these descriptions have been used to identify portions of each employer's total cumulative contributions and beneficial interest in the assets being held by the Trust.

**ANSWER:**  Defendants admit the allegations contained footnote 1.

ruling was withdrawn in 2009, the audit commenced again. Defendants deny the remaining allegations in Paragraph 21.

22. During late 2004 or early 2005, the fiduciary defendants decided to terminate the Trust without paying the "termination distributions" called for by the Trust Plan. The Fiduciary defendants, acting in concert with others, devised an elaborate and deceptively complex plan which would permit them to acquire control over the trust assets for their own benefit as opposed to making the "termination distributions" to the employee beneficiaries as required by the Trust Plan. The plan was designed to exploit the Trust and its assets to serve the financial interests of the fiduciary defendants and others at the expense of, the Trust, its employer participants and the employee beneficiaries of the Trust.

**ANSWER:** Defendants deny the allegations in Paragraph 22, which are false and directly contrary to the Reinsurance Agreement and audited financials, of which the Plaintiffs have copies.

**THE FIDUCIARY DEFENDANTS ENTER INTO AND EXECUTE A JOINT VENTURE AGREEMENT, AND PLAN TO TERMINATE THE TRUST, AND EXPLOIT THE ASSETS OF THE TRUST AND ITS PARTICIPANTS AND BENEFICIARIES FOR THEIR OWN PROFIT.**

To the extent this header requires a response, its content is denied.

23. In 2005 and through 2007, the fiduciary defendants acting in concert with others, including Nicholas Batoo, Carey Sunderlage and Andrew Keuls entered into, and carried out a preconceived joint venture agreement to terminate the Trust and transfer all its assets to an offshore "for profit" insurance company which would be owned and operated by the fiduciary defendants "for profit", and which would also provide a continual source of income to the fiduciary defendants through contracts for management and consulting services and exclusive insurance agency agreements (hereafter the "termination plan"). Pursuant to the termination plan the defendants engaged in the following wrongful conduct:

**ANSWER:** Defendants deny the allegations in Paragraph 23.

23 A). The implementation of the termination plan involved creating two offshore closely held insurance companies incorporated by the defendants in Anguilla, in the West Indies. The insurance companies were called Maven Assurance Ltd.(created on or about April 6, 2006 under the laws of Anguilla in the British West Indies) (hereafter "Maven Assurance") and Maven Life International Ltd. (hereafter "Maven Life").

**ANSWER:** Defendants deny the allegations in Paragraph 23 A).

23 B). Maven Assurance and Maven Life were incorporated by the fiduciary defendants in an offshore location so that the two insurance companies, and, the Trust assets which the defendants planned to transfer to them, would be beyond the jurisdiction of the United States Courts, thereby eliminating any possibility that the Trust, or its employee beneficiaries would have any access to the United States Federal Courts or the various state courts, to enforce or protect the rights of the Trust and the Trust beneficiaries.

**ANSWER:**    Defendants deny the allegations in Paragraph 23 B).

23 C). During the period that the fiduciary defendants were attempting to incorporate and get licenses approved for Maven Assurance and Maven Life, disclosures concerning the integrity and background of Tracy Sunderlage, among others, was required, by the Anguillan licensing authorities. In his submission to said authorities, Tracy Sunderlage, knowingly, and with intent to mislead, failed to disclose to the Anguillan licensing authorities the material fact that he was, at all times, subject to a permanent injunction issued by the U.S. District Court for violations of the antifraud provisions and registration provisions of the U.S. Securities Act of 1933, and that he was permanently enjoined him from selling or offering sale unregistered stock or securities. This was a material non disclosure in that at all times herein the defendants, intended to, and did, promote the sale of "non voting " "non registered " stock in Maven Assurance to the participants of the Trust.

**ANSWER:**    Defendants deny the allegations in Paragraph 23 C).

23 D). The true ownership of Maven Assurance and Maven Life was not disclosed to the employer participants or the employee beneficiaries of the Trust. The ownership of Maven Assurance and Maven Life was kept secret by creating and utilizing an offshore holding company to hide the true ownership of the two insurance companies. The offshore holding company was named Hess Holdings Ltd. (hereafter "Hess Holdings").

**ANSWER:**    Defendants deny the allegations in Paragraph 23 D).

23E). Thereafter, pursuant to the termination plan all the voting stock of Maven Assurance and Maven Life was issued to Hess Holdings.

**ANSWER:**    Defendants admit that the stock of Maven Assurance and Maven Life was owned by Hess Holdings.

23 F). The stock in Hess Holdings, was owned 50% by Linda Sunderlage (Tracy Sunderlage's wife) who held the stock for herself and as a straw man for the benefit of Tracy Sunderlage who at all times maintained control and, de facto, ownership of the

stock in Hess Holdings, and, accordingly directly or indirectly owned a 50% voting interest in Maven Assurance and Maven Life.

**ANSWER:**    deny the allegations in Paragraph 23 F), and state that Andrew Keuls owned

100% of Hess Holdings, until an Acadia Life annuity for the benefit of Linda Sunderlage became

a 50% owner in July 2007, as fully disclosed to all employers.

23 G).  Subsequently, at Tracy Sunderlage's direction, the Hess Holdings stock was transferred to a secret annuity in another offshore company named Acadia Life Ltd. Tracy Sunderlage and Linda Sunderlage, or their designees are the beneficiaries of the Acadia Life Ltd. annuity.

**ANSWER:**    Defendants deny the allegations of Paragraph 23 G).

23 H).  The remaining 50% of the stock of Hess Holdings was issued to an offshore (Anguilla) company named Family Office Services Ltd. which is wholly owned by one Andrew Kuels, who at all times lives in the Philippines, and, was a joint venture with Sunderlage with respect to the termination plan to exploit the Trust.[2]

**ANSWER:**    Defendants deny the allegations of Paragraph 23 H), including footnote 2 on

information and belief.

23 I).   Tracy Sunderlage then served as a director and CEO of Maven Assurance after its formation, at the same time that he was serving as a fiduciary of the Trust and as an owner, officer and director of PBT LTD and PBT LLC.

**ANSWER:**    The allegations of Paragraph 23 I) call for legal conclusions that require no

response.   To the extent a response is required, Defendants admit the allegations of

Paragraph 23 I).

23 J).   In July of 2006, as part of the pre-conceived termination plan, the fiduciary defendants, through PBT Ltd., caused the Trust to sign a contract with Maven Assurance (hereafter the "reinsurance agreement"). Pursuant to the reinsurance agreement the fiduciary defendants  caused the Trust to transfer all of its assets (approximately $60,000,000.00) to Maven Assurance as an purported re-insurance

---

[2]  Andrew Kuels is the current CEO of Maven Assurance Ltd., and is believed to be living in a multi million dollar gated community in the Philippines located approximately 9000 miles from the "official" office of Maven Assurance in Anguilla, where he is supposed to be running the company. On information and belief, he has never been to the Anguilla office of Maven.

"premium" thereby leaving the Trust virtually bankrupt, and its beneficiaries at the complete mercy of Maven Assurance, a non fiduciary, which now had title to and control of all the money and other assets that once were being held by the Trust for the benefit of the employee beneficiaries of the Trust.

**ANSWER:**   Defendants admit that in July 2006 the Trust entered a reinsurance agreement with Maven Assurance, pursuant to which an actuarially-determined premium of approximately $60,000,000 was paid.   Defendants deny the remaining allegations of Paragraph 23 J).

23 K).  Prior to and at the time the reinsurance agreement was signed Sunderlage was on both sides of the transaction. He was serving as a trust fiduciary and owner, of PBT, LTD while at the same time he was acting as an officer and owner of Maven Assurance and Maven Life.

**ANSWER:**   Defendants deny the allegations of Paragraph 23 K).

23 L).  As part of the termination plan the defendants also agreed in advance to transfer to Maven Assurance, what the defendants' referred to as, their "book of business".  This "book of business" consisted of the block of all the contribution paying participants of the Trust.

**ANSWER:**   Defendants deny the allegations of Paragraph 23 L).

23 M). The transfer of the Trust's "book of business" to Maven Assurance provided assurance to the joint venturers that Maven Assurance would have an immediate, and future, stream of premium income worth an estimated $25,000,000.00 a year.

**ANSWER:**   Defendants deny the allegations in Paragraph 23 M), and state that the estimated $25,000,000 as stated in the business plan was premium income, not profit.

23 N). After the signing of the reinsurance agreement the defendants systematically transferred all the Trust's assets ($60,000,000.00) to Maven Assurance, as well as the Trust's "book of business".

**ANSWER:**   Defendants deny the allegations in Paragraph 23 N), and state that the Trust Assets included its book of business.

-13-

23 O). Upon the completion of the transfer to Maven Assurance of the Trust's assets and "book of business" Sunderlage, and the other joint venturers now owned and controlled two "for profit" insurance companies. One of them, Maven Assurance, had, overnight, become an insurance company with $60,000,000.00 in assets, and projected future income of approximately $25,000,000.00 a year.

**ANSWER:** Defendants deny the allegations in Paragraph 23 O).

23 P). In addition to the foregoing, and as a further part of the termination plan it was agreed by the defendants that other businesses, owned and/or controlled by Tracy Sunderlage would reap additional, financial benefits by being awarded exclusive "no bid" contracts with Maven Assurance and Maven Life to provide management and consulting services, and "exclusive" insurance sales services for Maven Assurance and Maven Life for which they would be paid lucrative fees and commissions. The following Sunderlage companies received the financial benefits of these contracts:

    a.) <u>SRG International Ltd.</u> is an offshore Company operating out of Sunderlage's office in Algonquin Illinois. 90% of the stock of SRG International Ltd is owned by Tracy Sunderlage in offshore trust. The other 10% of SRG International is owned by Tracy Sunderlage's son, Carey Sunderlage. SRG International Ltd. was given contracts making it the "exclusive" distributor, on a commission basis, for all of the insurance products sold by Maven Assurance and Maven Life. On information and belief its gross annual revenues from its dealings with the Maven insurance companies exceed $2,000,000.00.

**ANSWER:** Defendants admit that companies in which Tracy Sunderlage owned an interest entered contracts to provide services to Maven Assurance and Maven Life for which they were paid fees and commissions. Defendants further admit that SRG International, Ltd. is a foreign corporation and that it serves as a distributor for insurance products issued by Maven Assurance and Maven Life and several other international insurance companies. Defendants state that 90% of the stock of SRG International Ltd is owned not by Sunderlage, but rather by an irrevocable spendthrift trust controlled by an independent trustee. Defendants deny the remaining allegations in Paragraphs 23 P) and 23 P) a).

    b.) <u>Sunderlage Resource Group Inc.</u> is an Illinois corporation owned 51% by Tracy Sunderlage and 49% by his wife, Linda Sunderlage. Sunderlage source Group Inc. also receives commission income from sales of Maven

Assurance's and Maven Life's insurance products. This commission income is passed through to Sunderlage Resource Group Inc. from SRG International Ltd.

**ANSWER:** Defendants admit that Sunderlage Resource Group, Inc. is an Illinois corporation, that Tracy Sunderlage owns 51% of its shares and Linda Sunderlage owns 49% of its shares, and that it receives commissions from the sale of products issued by Maven Assurance and Maven Life. Defendants further state that all commissions were paid by SRG, Inc., to advisors. Defendants deny the remaining allegations in Paragraph 23 P) b.).

c.) Defendant, PBT Administration LLC. was owned 90% by Tracy Sunderlage and 10% by SRG International Ltd. It was given consulting contracts with Maven Assurance and Maven Life to serve as the companies' contract administrator, and receives substantial fees from Maven Assurance.

**ANSWER:** Defendants admit that Tracy Sunderlage owned 90% of the shares in PBT Administration, LLC, that it had agreements to serve as an administrator for Maven Assurance and Maven Life, that it became the third-party administrator in 2008, and that it received fees as a result of providing those services. Defendants deny the remaining allegations in Paragraph 23 P) c.).

d.) Randall Administration LLC is an Illinois Limited Liability Company which was wholly owned and managed by Sunderlage Resource Group Inc., which in turn is owned 51% by Tracy Sunderlage and 49% by Linda Sunderlage. Randall Administration LLC was also paid fees as a third party administrator for Maven Assurance and Maven Life.

**ANSWER:** Defendants deny that Randall Administration is owned by Sunderlage Resource Group, Inc. , and on information and belief, admits the remaining allegations in Paragraph 23 P) d.).

e.) Hess Management Ltd is an offshore company believed to be a wholly owned subsidiary of Hess Holdings Ltd., (which is 50% owned by Sunderlage). Hess Management manages the operations of Maven Assurance and Maven Life and also appoints the "Maven Professional Executive Committee" which controls and approves Maven Assurance's expenditures of funds. Tracy

> Sunderlage was an officer and Director of Hess Management and, on information and belief was, and is, a member of the Maven Professional Executive Committee. Hess has management contracts with Maven Assurance and Maven Life which call for the payment of management fees.

**ANSWER:** Defendants admit that Hess Management, Ltd. is a foreign corporation that serves as the administrator for Maven Life. Defendants deny the remaining allegations in Paragraph 23 P) e.)

> 23 Q). After transferring all the Trusts assets to Maven Assurance the fiduciary defendants declared the Trust terminated as of October 31, 2006. No termination distributions were paid to the beneficiaries as required by the Trust Plan. The defendants, however, continued to exercise de facto control over Maven Assurance and the assets of the Trust which were now owned and controlled offshore by Maven Assurance.

**ANSWER:** Defendants admit that the Trust was terminated on or about October 31, 2006. Defendants deny the remaining allegations in Paragraph 23 Q).

> 23 R). Following the termination of Trust the defendants, acting in concert with Maven, and pursuant to the preconceived termination plan, set up a number of accounts that they called "Premium Protected Accounts" (hereafter "PPA"). These PPA accounts were owned by Maven Assurance and were utilized as a way of keeping track of the amount of money which had formerly been each employee groups "beneficial interest" described in the now terminated Trust. The defendants, acting in concert with Maven, now required that the former Trust participants purchase "non voting" "non participating" shares in Maven Assurance for $2500.00, by a date certain, in order to gain potential access to the amounts designated for that employee beneficiary group's PPA. The fiduciary defendants informed the former participants that failure to purchase the stock would result in forfeiture of the amounts assigned to that employee group's designated PPA, which in the case of the plaintiffs was $3,515,000.00. The former Trust participants were also pressured to sign up for new individual welfare plans under section 419(e) of the IRS Code[3]. These procedures were designed to put the participating employers under financial duress to open a new 419(e) plan (with the defendants serving as Trustee and Administrator) or, else suffer the loss of their employee groups "beneficial interest" which was now assigned to a PPA owned by Maven and the fiduciary defendants. The defendants provided new 419(e) forms for the participants to

---

[3] These 419(e) plans were newly created plans that had to be sponsored by each individual employer. They were different in character and operation from the 419(A)(f)(6) multiple employer plan which the defendants had terminated on October 31, 2006.

sign. The forms contained provisions for the "irrevocable" appointment of the defendants, PBT Ltd and PBT LLC, as Trustee and Administrator of each new individual 419(e) plan.

**ANSWER:**     Defendants deny the allegations in Paragraph 23 R).

24.     That Maven Assurance, and also, Maven Life were at all relevant times herein a "parties in interest" within the meaning of 29 U.S.C. 1002 (14), in that Maven Assurance and Maven Life were 50% owned directly or indirectly by Tracy Sunderlage, a plan fiduciary, and/or Linda Sunderlage, a plan fiduciary, and a relative (wife) of Tracy. Maven was also a provider of services to the Trust.

**ANSWER:**     Paragraph 24 contains legal conclusions that require no response. To the extent a

response is required, defendants deny the allegations in Paragraph 24.

25.     That at the time of the Trust's formal termination on October 31, 2006 the Trust had approximately 275 employee beneficiaries who were deprived of termination distributions and a fair allocation of trust assets as required by section 13.3 of the Trust plan. The identity of the employee beneficiaries and the amounts due them from the Trust can be determined from information contained on a document attached to the "reinsurance agreement" as Schedule #1. Said document has been designated as confidential by the defendants and is not attached as an exhibit hereto.

**ANSWER:**     Defendants admit the beneficiaries of the Trust who elected to participate in the

Maven structure can be identified from Schedule 1 to the Reinsurance Agreement. Defendants

deny the remaining allegations in Paragraph 25.

26.     That the fiduciary defendants violated the provisions of ERISA sections 404, 405, 406 and 409 and breached the fiduciary and statutory duties owed by the fiduciary defendants to the Trust, its participants, and its beneficiaries, in that the fiduciary defendants: engaged in various "prohibited transactions" identified below; failed to discharge their duties in the sole interests of the Trust's participants and beneficiaries, including the plaintiffs; failed to operate the Trust with the care, skill, prudence, and diligence that a prudent man acting in a like capacity would have exercised in the conduct of the Trust's business; in one or more of the following ways:

26 A)     The fiduciary defendants caused the Trust to engage in a "prohibited transaction" with the Maven Assurance, to wit; the reinsurance agreement and other agreements with Sunderlage companies in violation of 29 U.S.C. 1106 (b)(1) and (b)(2) in the fiduciary defendants dealt with the assets of the Trust in their own self interest and on their own account when they agreed to, and did, transfer all the Trusts assets to Maven Assurance with full knowledge that the Sunderlages owned a financial interest in Maven Assurance, and with full knowledge that companies owned and controlled by the defendants profited by the transaction as a result of management and consulting

agreements with Maven Assurance and Maven Life and exclusive sales agreements with Maven Assurance and Maven Life, as alleged in paragraphs 22 and 23 of this Count.

**ANSWER:**   Paragraphs 26 and 26 A) contain legal conclusions that require no response.  To

the extent a response is required, defendants deny the allegations in Paragraphs 26 and 26 A).

26 B)   The fiduciary defendants caused the Trust to engage in a "prohibited transaction" in violation of 29 U.S.C. 1106 (a)(1)(A), and/or (a)(1)(C),and/or (a)(1)(D), in the fiduciary defendants agreed to transactions and agreements with Maven Assurance, and Maven Life, "parties in interest" as alleged in paragraph 24 of this Count, including, the reinsurance agreement and the other agreements with Sunderlage companies as alleged in paragraphs 22 and 23 of this Count.

**ANSWER:**   Paragraph 26 B) contains legal conclusions that require no response.  To the

extent a response is required, defendants deny the allegations in Paragraph 26 B).

26 C).  Failed to operate the Trust in accordance with the governing Trust Plan in that the fiduciary defendants, after deciding that they were going to terminate the Trust plan, willfully, and with intent to profit thereby conspired and agreed to a termination plan that was contrary to the terms of the Trust Plan and was designed as to exploit the Trust and its assets to further the financial interests of the fiduciary defendants at the expense of the Trust and the beneficiaries and in disregard of the clear requirements of the Trust Plan to fairly allocate and pay the assets of the Trust to the employee beneficiaries as "termination distributions" based upon their respective beneficial interests in the Trust pursuant to section 13.3, and other related sections of the Trust Plan.

**ANSWER:**   Paragraph 26 C) contains legal conclusions that require no response.  To the

extent a response is required, defendants deny the allegations in Paragraph 26 C).

26 D).  Failed to operate the Trust solely in the sole interests of the participants and beneficiaries of the Trust in that the fiduciary defendants entered into an undisclosed joint venture agreement with Nicolai Batoo, Andrew Kuels, Linda Sunderlage and Carey Sunderlage to execute a termination plan which was designed to exploit Trust and its participants by transferring the ownership of $60,000,000.00 of Trust assets and Trust business to Maven Assurance Ltd, under the guise of a "premium payment" and by further utilizing the Trust and its assets to set up, and guarantee, the profitability of, two offshore insurance companies to be secretly owned by Tracy Sunderlage or his designee. Which said companies, Maven Assurance and Maven Life, provided profits to the fiduciary defendants and other related corporations and entities owned, and/or, controlled by the defendants as alleged in paragraph 23 of this Count. The foregoing conduct was also a "prohibited transaction " in violation of 29 U.S.C. 1106 (b)(1) and (b)(2) in that the fiduciary defendants, by entering into the joint venture agreement and termination

-18-

plan, were guilty of dealing with the assets of the Trust in their own self interest and on their own account.

**ANSWER:**    Paragraph 26 D) contains legal conclusions that require no response.   To the extent a response is required, defendants deny the allegations in Paragraph 26 D), which are contradicted by documents the Plaintiffs have.

26 E). Transferred the ownership of all of the Trust's assets outside the jurisdiction of the District Courts of the United States in violation ERISA section 404 (b).

**ANSWER:**    Paragraph 26 E) contains legal conclusions that require no response.   To the extent a response is required, defendants deny the allegations in Paragraph 26 E).

26 F). Failed to take proper and prudent steps to assure that all employee beneficiaries of the terminated Trust were treated equally, and that the assets of the Trust were allocated equally and fairly among the employee beneficiaries of the Trust.

**ANSWER:**    Paragraph 26 F) contains legal conclusions that require no response.   To the extent a response is required, defendants deny the allegations in Paragraph 26 F).

26 G). With full knowledge that a decision had been made to terminate the Trust, engaged in competition with the Trust, and intentionally diminished and diluted the Trust assets, by encouraging Trust participants to withdraw from the multiple employer 419(a)(f)(6) Trust and establish separate and competing individual 419(e) plans to be managed, and administered, for profit, by the defendants herein thereby diverting assets and additional future contributions away from the Trust.    Said conduct also resulted in an unequal distribution of Trust assets in the participants who withdrew and opened new 419(e) plans with the defendant were rewarded by receiving immediate cash assets from the Trust as opposed to a fair allocation and distribution of all "pooled assets" of the Trust as required by the Trust plan.

**ANSWER:**    Paragraph 26 G) contains legal conclusions that require no response.   To the extent a response is required, defendants deny the allegations in Paragraph 26 G).

26 H). Willfully violated the provisions of the permanent injunction entered by the United States District Court against Sunderlage by selling and offering for sale "non voting" "non participating" shares of Maven Assurance stock to the Trust participants for $2500.00, and by requiring Trust participants to purchase said stock or risk forfeiture of their employee group's beneficial interest.

**ANSWER:**    Paragraph 26 H) contains legal conclusions that require no response.  To the extent a response is required, defendants deny the allegations in Paragraph 26 H).  Defendants further state that no stock was ever sold to any U.S. Citizen, and were only sold to Acadia Life or PBT as Trustee of 419(e) Plans.

26 I).  Failed disclose to the Trust participants, prior to selling them stock in Maven Assurance, the material fact that Sunderlage had been sanctioned by the U.S. District Court for alleged securities fraud violations (as alleged in paragraph 8 of this Count) and that he was at all times subject to a permanent injunction, issued by the same court, prohibiting him or his companies from selling or offering for sale unregistered stock or securities.

**ANSWER:**    Paragraph 26 I) contains legal conclusions that require no response.  To the extent a response is required, defendants deny the allegations in Paragraph 26 I).

27.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Trust and its beneficiaries, including the plaintiffs, have been directly and indirectly damaged in the amount of approximately $60,000,000.00 together with all profits and earnings thereon. Moreover, the Plaintiffs and the other 275 employee beneficiaries of the Trust have been deprived of the right to the payment of required termination distributions benefits called for by Trust Plan upon termination of the Trust.

**ANSWER:**    Paragraph 27 contains legal conclusions that require no response.  To the extent a response is required, defendants deny the allegations in Paragraph 27.  Defendants further state that plaintiffs have not alleged class allegations, a class has not been proposed or certified, and plaintiffs lack standing to pursue claims on behalf of any parties other than themselves.

28.    That the fiduciary defendants  and each of them, had knowledge of their own, and each others,  breaches of fiduciary duty as alleged above, and failed to take any action to prevent or correct said breaches and acted jointly and in concert with respect to said breaches, and that it would be futile for the plaintiffs to demand that the defendants restore the damages sustained by the Trust, and, indirectly by its beneficiaries, since the defendants have refused to take any action to correct their wrongful conduct, and deny any liability, and have taken the position that the Trust is no longer in existence and therefore no duties are owed to the Trust or its beneficiaries.

**ANSWER:**    Paragraph 28 contains legal conclusions that require no response.  To the extent a response is required, defendants deny the allegations in Paragraph 28.

29. That plaintiffs did not have actual knowledge of the defendant's violations of law and conduct constituting breaches of fiduciary duty until such facts were discovered during the course of discovery in this case.

**ANSWER:** Defendants deny that they violated the law or breached any fiduciary duties.

Defendants further state that they lack knowledge and information sufficient to form a belief regarding the allegations in Paragraph 29 and therefore deny those allegations.

**WHEREFORE,** the plaintiffs pray for the following relief:

A. That the Court declare that the actions of the fiduciary defendants, as alleged herein, constituted violations of the defendants' fiduciary duties and statutory duties under ERISA, Sections 404, 405, 406 and 407 and also under the common law.

B). That the Court Order the fiduciary defendants, and each of them, to make restitution to the Trust and restore or replace to the Trust the $60,000,000.00 in Trust assets transferred to Maven Assurance together with the costs and expenses associated with the creation of Maven Assurance and Maven Life, plus interest due the Trust on said amount by reason of the Trust being deprived of said assets. In the alternative plaintiffs pray that the Court enter judgment for said amounts in favor of the Trust and against the defendants jointly and severally.

C) That the Court enter an order requiring the fiduciary defendants, and each of them to disgorge any earnings or profits that they have realized, either directly, or indirectly, as a result of their breaches of fiduciary duty and order that all such profits and earnings be paid to the Trust. In the alternative, that the Court enter judgment for said amount in favor of the Trust and against the defendants jointly and severally.

D) That the Court appoints an equitable Receiver pursuant to FRCP 66 to perform the following actions:

a). To take possession of any or property funds ordered restored by the fiduciary defendants to the Trust or collected from the defendants on behalf of the Trust and to administer said funds according to the provision of the Trust Plan by calculating, allocating, and disbursing to the employee beneficiaries, including the plaintiffs, the amounts due them as termination distributions called for by paragraph 13.3 of the Trust Plan.

b). To contact the Trust beneficiaries who were members of the Trust as of October 31, 2006 when the Trust was terminated and advise them of this action and their rights under the Trust Plan.

c).     To conduct any further investigations of the wrongdoing of the defendants or location of any assets which properly belong to the Trust and, indirectly, to its employee beneficiaries.

E).     For and award of for costs and attorneys fees associated with the bringing of this action pursuant to 29 U.S.C. 1132(g)(1)

F).     That the Court enjoin the defendants and any of the Sunderlage owned companies alleged in subparagraph 23P herein from any further involvement in the operation of management of the Trust or any assets of the Trust, and from any involvement in the ownership or management of Maven Assurance or Maven Life, or from receiving any payments directly or indirectly from Maven Assurance or Maven Life or any of their affiliates.

G.     For such further equitable relief as is warranted by the evidence.

**ANSWER:**     Defendants deny that plaintiffs are entitled to any relief.

## COUNT II

### (Breach of Fiduciary Duty.  Loan "A" ($4,417,966.00 )  and Loan "C" ($3,000,000.00) to Dufferin Capital Ltd. and/or Fidelity Insurance.)

Now come the plaintiffs, Dave Mintjal and Therese Mintjal, individually and in a derivative capacity on behalf of the Trust and its participants and beneficiaries pursuant to ERISA Sections 502(a)(2) and 502(a)(3), and for claim against the defendants Tracy Sunderlage, Linda Sunderlage, Professional Benefit Trust Ltd. and PBT Administration LLC (hereafter, collectively referred to as fiduciary defendants)  and each of them, jointly severally or in the alternative, state as follows:

1-21.     The plaintiffs repeat and re-allege paragraphs 1 through 21 of Count I as paragraphs 1 through 21 of this Count.

**ANSWER:**     Defendants repeat and re-allege and expressly incorporate their responses to Paragraphs 1 through 21 of Count I as their response to paragraphs 1-21 of Count II.  Defendants further deny that plaintiffs have standing to bring claims on behalf of the Trust, its participants or its beneficiaries.

22.     At all times mentioned herein Alliance Holdings Company (Alliance) was a closely held, privately owned, offshore holding company believed to be at least 50% owned and controlled by one Duane J. Crithfield  (hereafter, Crithfield).  Crithfield is an officer and director of Alliance. And was also a service provider and a fiduciary of the Trust as alleged in paragraph 25 of this Count.  Alliance is a "party in interest pursuant to 29 U.S.C. 1002 (G).

-22-

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegations in Paragraph 22 and therefore deny those allegations.

23.     That Alliance wholly owns all the stock in the following offshore subsidiaries: Fidelity Insurance Company Ltd. (hereafter, "Fidelity Insurance"), First Fidelity Trust Ltd. (hereafter, "Fidelity Trust") and Westminster Hope and Turnberry Ltd. (Hereafter "WH&T").

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegations in Paragraph 23 and therefore deny those allegations.

24.     At all times mentioned herein, Fidelity Trust served as a Co-Trustee of the Trust together with defendant, PBT Ltd., and was a custodian of the Trust's assets and provided services to the Trust. Fidelity Trust exercised discretionary authority and control over the Trust 's investments, and the management of the Trust, and was a fiduciary with respect to the Trust within the meaning of ERISA Section 3 (21)(A).

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 24.    The second sentence of Paragraph 24 states legal conclusions to which no response is required.  To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegations in the second sentence of Paragraph 24 and therefore deny those allegations.

25.     Crithfield was also an officer and/or director of Fidelity Trust. Crithfield, directly or indirectly, owned, or controlled, a 50% interest in the voting stock and the profits of Fidelity Trust, and supervised the custody and control of the Trust's assets and provided services to the Trust and exercised discretionary authority and control over the Trust's investments, and the management of the Trust.   Crithfield was also a member of the Trust's Advisory Board. Crithfield was a fiduciary with respect to the Trust within the meaning of ERISA Section 3 (21)(A).

**ANSWER:** Defendants deny that Crithfield was a member of the Trust's Advisory Board, and lack knowledge and information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 25 and therefore deny those allegations.

26.     Fidelity Trust and Crithfield were "parties in interest" within the meaning of 29 U.S.C. 1002 (14) (A) and (B).

**ANSWER:** Paragraph 26 states legal conclusions which require no response. To the extent a response is required, defendants deny the allegations in Paragraph 26.

27. At all times mentioned herein Fidelity Insurance Company Ltd. was an offshore insurance company which provided insurance services to the Trust. Crithfield, a trust fiduciary, was also an officer, and/or director, of Fidelity Insurance. Crithfield, directly or indirectly, owned or controlled a 50% interest in the voting stock and the profits of Fidelity Insurance.

**ANSWER:** Defendants deny that Crithfield was a trust fiduciary and, on information and belief, that he was an officer or director of Fidelity Insurance. Defendants lack knowledge and information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 27 and therefore deny those allegations.

28. Fidelity Insurance was a "party in interest" within the meaning of 29 USC 1002 (G).

**ANSWER:** Paragraph 28 states a legal conclusion that requires no response. To the extent a response is required, defendants deny the allegations in Paragraph 28.

29. Westminster Hope and Turnberry (WH&T) was an offshore financial services company. Crithfield was an officer and/or director of WH&T, and on information and belief, directly or indirectly owned, or controlled, a 50% interest in the voting stock and the profits of WH&T. WH&T was a fiduciary of the Trust within the meaning of ERISA Section 3 (21)(A) in that WH&T was had custody and control of the Trust's assets related to loans A, B and C and provided services to the Trust and exercised discretionary authority and control over the Trust's Assets.

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegations in Paragraph 29 and therefore deny those allegations.

30. At all times mentioned herein Dufferin Capital Limited (hereafter "Dufferin") was, on information and belief, is a direct or indirect subsidiary or affiliate of Fidelity Insurance. Dufferin was set up for the sole purpose of acquiring money from the Trust through loans set up and agreed to by the fiduciary defendants. Crithfield, a Trust fiduciary, was also an officer and/or director of Dufferin, and, on information and belief, directly or indirectly, owned or controlled, a 50% interest in the voting stock and the profits of Dufferin.

**ANSWER:**     On information and belief, Defendants admit that Dufferin was a direct or indirect

subsidiary of Fidelity Insurance.  Defendants lack knowledge and information sufficient to form

a belief regarding the truth of the remaining allegations in Paragraph 30 and therefore deny those

allegations.

31.     Dufferin Capital was a "party in interest" within the meaning of 29 U.S.C. 1002
(G).

**ANSWER:**     Paragraph 31 states a legal conclusion that requires no response.  To the extent a

response is required, defendants deny the allegations in Paragraph 31.

32.     On or about January 1, 2002 the defendants, through Sunderlage and PBT LTD.
entered into entered into a joint venture or partnership agreement (hereafter, "joint venture") with
Dufferin and/or Fidelity Insurance.  On information and belief, and as part of the joint venture
agreement, the defendants and Fidelity Trust, using the Trust's assets, caused a loan to be made
by the Trust to Dufferin and/or Fidelity Insurance in the amount of  $4,417,966.00 (hereafter,
"loan "A").  As part of the joint venture agreement, Dufferin and/or Fidelity Insurance signed a
note to the Trust for the amount of the loan and agreed to pay interest until the note's due date of
12/31/2006.  The actual terms of the joint venture agreement, and the exact terms of the note or
other loan documentation are unknown.[4]  The loan proceeds were to be used to buy CDO's and
CLO's.

**ANSWER:**     Defendants admit that the Trust obtained a Note from Dufferin on or about

January 1, 2002, in the principal amount of $4,417,966, pursuant to which interest would be paid

until the maturity date of December 31, 2006.  Defendants lack knowledge and information

sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 32 and

therefore deny those allegations.  The remaining allegations of paragraph 32 also state legal

conclusions that requires no response.  To the extent a response is required, defendants deny

those allegations in Paragraph 32.

33.     On or about January 1, 2003 the defendants, and Fidelity Trust, using Trust assets,
caused another loan to be made to Dufferin and/or Fidelity Insurance in the amount of

---

[4] The allegations relating to this count are made on information and belief due to the fact that the defendants claim
they have no records or copies of any notes, agreements, or other records relating to these multi million dollar loans.