**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID MINTJAL and THERESE MINTJAL, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 08-cv-5681 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| PROFESSIONAL BENEFIT TRUST, | ) | |
| MULTIPLE EMPLOYER WELFARE | ) | |
| BENEFIT PLAN & TRUST, PBT | ) | |
| ADMINISTRATION, LTD., TRACY | ) | |
| SUNDERLAGE, LINDA SUNDERLAGE, | ) | |
| MAVEN ASSURANCE, LTD., SUNDERLAGE | ) | |
| RESOURCE GROUP, INC., and SRG | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This action is brought pursuant to various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") for alleged breaches of fiduciary duties. Before the Court is Plaintiffs' motion for partial summary judgment "on the issue of the Defendants' liability for the conduct alleged in the second amended complaint." [269]. Defendants Tracy Sunderlage and Linda Sunderlage ("the Sunderlages") and Maven Assurance, Ltd. ("Maven") have opposed the motion. For the reasons that follow, the Court grants in part and denies in part the motion. The Court grants Plaintiffs' motion [281] on the issues of liability against (1) the Sunderlages for breaches of their fiduciary duties with regard to the transactions with Maven, (2) Maven's liability as a party in interest in prohibited transactions with the named plan fiduciaries PBT Administration and PBT Ltd., (3) the termination of the PBT Trust, (4) the award of the $2,163,000 administrative fee when the PBT Trust was terminated, and (5) SRG Inc. and SRG International's liability for aiding and abetting the breaches of fiduciary duties by Tracy

Sunderlage. The Court denies Plaintiffs' motion as to the 2002 and 2004 Loans from the PBT Trust to Dufferin.

I.     Background

A.     Statements of Facts and Supporting Memoranda

Unless otherwise indicated, the Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 Statements, which include Plaintiffs' L.R. 56.1 Statement of Material Facts [280], the Sunderlages' Response to Plaintiffs' L.R. Statement [294], Maven's Response to Plaintiffs' L.R. Statement and Statement of Additional Facts [298], and Plaintiffs' Response to Maven's Additional Facts [311]. Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and which entitles the movant to judgment as a matter of law. As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). It simply is not the Court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in [her] client's favor[.]" *Dal Pozzo v. Basic Machinery Co.*, 463 F.3d 609, 613 (7th Cir. 2006).

The Court carefully reviews the parties' statements of material facts and eliminates from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004). Merely including facts in a responsive

memorandum is insufficient to put issues before the Court.  *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000).  Rule 56.1 also requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence.  See L.R. 56.1; *Malec*, 191 F.R.D. at 583–85.

Of particular importance here is the requirement that a party's disagreement with a particular statement of fact be supported by the record.  Local Rule 56.1(b)(3) states:

> Each party opposing a motion filed pursuant to Fed. R. Civ. P. 56 shall serve and file * * * a concise response to the movant's statement that shall contain: * * * a response to each numbered paragraph in the moving party's statement, *including, in the case of any disagreement, specific reference to the affidavits, parts of the record, and other supporting materials relied upon*[.]

(emphasis added).  Accordingly, under this rule, "a general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."  *Malec*, 191 F.R.D. at 584.  The upshot is that where a party improperly denies a statement of fact by failing to provide evidentiary support for the denial, the Court deems that statement of fact to be admitted.  As the district court put it in *Malec*, "We cannot stress the importance of [the nonmovant's L.R. 56.1 response] enough: a nonmovant's failure to adhere to [L.R. 56.1(b)(3)] is equivalent to admitting the movant's case.  *Id.*  Indeed, "the penalty for failing to properly respond to a movant's 56.1(a) statement is usually summary judgment for the movant (at least if the movant has done his or her job correctly) because the movant's factual allegations are deemed admitted."  *Id.*  Here, the Sunderlages have disagreed with many of Plaintiffs' fact statements, but often fail to cite to the record in support of their disagreement. The Court accordingly must deem any facts that have not been properly denied as admitted.

In addition, the Sunderlages failed to submit a brief in opposition to Plaintiffs' motion for

summary judgment, despite having more than two months to do so. To be sure, the Court must liberally construe a *pro se* litigant's pleadings to "give [him] a break when, although he stumbles on a technicality, his pleading is otherwise understandable," *Greer v. Bd. of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001), but that forgiving standard does not permit this Court to excuse a *pro se* litigant's failure to file the required pleading altogether. Plaintiffs' motion for summary judgment was filed on November 4, 2014, and on November 21, 2014, this Court set a briefing schedule that called for response briefs to be filed by January 9, 2015. [289]. The Sunderlages never requested an extension of time. In addition, when Plaintiffs moved for summary judgment they notified the Sunderlages that their response must comply with the Local Rule 56.1, see [271], which requires the opponent of a motion for summary judgment to file a supporting memorandum of law, see L.R. 56.1(b)(2). The Sunderlages nonetheless failed to file a response brief setting forth their legal arguments for why the Court should deny summary judgment on these issues. The absence of any response has hampered the Court's ability to understand the Sunderlages' position as to their compliance with their alleged status as fiduciaries under ERISA.

The Court further notes that it previously denied the Sunderlages' request to have an attorney recruited to represent them free of charge, as the assets listed on the Sunderlages' financial affidavit vastly exceed the resources available to litigants who qualify for *in forma pauperis* status. See [293]. "[E]ven *pro se* litigants must follow rules of civil procedure," *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006), and the Court "may insist upon adherence to its local rules even from a *pro se* litigant." *Nowak v. Transp. Joint Agreement of Cmty. Consol. Sch. Dist. No. 47*, 255 F. App'x 85, 87 (7th Cir. 2007). The Court accordingly may grant summary judgment against the Sunderlages based on their failure to properly oppose Plaintiffs' motion.

See *id.* ("Local Rule 56.1(b)(2) requires the opponent of a motion for summary judgment to file a supporting memorandum of law. [The plaintiff] did not comply, and on that basis alone the district court was within its authority to grant summary judgment to [the defendant].").

The Court also notes that the various bankruptcy proceedings of three of the defendants do not bar the proceedings before the Court. The U.S. Bankruptcy Court for the Northern District of Illinois terminated both PBT Administration's bankruptcy case and the Sunderlage Resource Group's bankruptcy case on June 27, 2014 and April 13, 2015, respectively. Tracy Sunderlage's bankruptcy is still pending, but the Bankruptcy Court entered orders in each of the three defendants' bankruptcy cases which lifted the automatic stay of bankruptcy and permitted Plaintiffs to proceed with this case. See [316], Ex. 1 at 1-3.

**B.     Facts**

Beginning in 1995, Plaintiffs' employer, General Produce Distributors, Inc., participated in the Professional Benefit Multiple Employer Welfare Benefit Plan & Trust ("the PBT Trust"), which provided death and living benefits to employees of participating employers. [311], Maven's Add'l Facts at 1-2. Plaintiffs David and Therese Mintjal were beneficiaries of the Trust between 1995 and 2006. *Id.* at 4. Defendant Professional Benefit Trust, Ltd. ("PBT Ltd.") was the trustee of the PBT Trust, *id.* at 3, Defendant PBT Administration, LLC ("PBT Administration") was the administrator, and a company called Professional and Small Business Council Inc. was the trust sponsor. [281], Pls.' Mem. at 33. Plaintiffs allege that Tracy Sunderlage owned, controlled, and operated PBT, Ltd. and PBT Administration and that he was a fiduciary with respect to the PBT Trust. [145], Sec. Am. Compl. ("SAC") at 6. The evidence indicates that Tracy Sunderlage was the CEO and Chairman of the PBT Trust. See, *e.g.*, [274] Ex. 36. Plaintiffs further allege that Linda Sunderlage, Tracy's wife and business partner, also

was a fiduciary as she exercised discretionary authority and control over the management of the Trust. [145], SAC 7.

Prior to its termination, the PBT Trust was a multiple employer plan. The assets of the PBT Trust, including contributions by participating employers, were held in a single pool. [145], SAC 5. At the end of the year, each participating employer was designated a "beneficial interest" in the Trust based on the pro rata of its investment or contribution to the Trust. *Id.* at 6.

Plaintiffs move for summary judgment as to various alleged breaches of fiduciary duties committed by Defendants. The alleged breaches occurred in connection with three major events: (1) the termination of the PBT Trust and General Produce's decision to no longer participate in a new single employer model with Maven, (2) certain loans that the PBT Trust made to a West Indies company called Dufferin Capital, Ltd. ("Dufferin") in 2002 and 2004, and (3) a $2.16 million administrative fee that Tracy Sunderlage awarded himself for administration of the PBT Trust. These events are summarized below.

**The Termination of the PBT Trust and General Produce's Withdrawal from Maven**

In early 2005, Tracy Sunderlage planned to terminate the PBT Trust and set up single employer plans under Section 419(e) of the Internal Revenue Code that would be administered through Maven, a captive insurance company, rather than through the Trust. [298], Maven's Add'l Facts 7. Tracy Sunderlage was a member of the Board of Directors of Maven from its inception on April 24, 2006 until October 4, 2006. [280], Pls.' Facts 82. The parties dispute the reason for the change. Maven contends that "anticipated changes in IRS regulations" were behind the decision to terminate the Trust, [298], Maven's Add'l Facts 7, whereas Plaintiffs contend that the change was necessitated by (1) a 2000 adverse IRS Revenue Ruling that found that the Trust did not meet the statutory requirements for a multiple employer plan and (2) a

2004 investigation into Tracy Sunderlage's operation of an abusive tax shelter. [311], Pls.' Resp to Add'l Facts 7. Regardless of the reason, it is undisputed that on March 14, 2005, Tracy Sunderlage sent a letter to the participating employers of the Trust discussing the conversion to a new structure. [280], Pls.' Facts 30.

Thereafter, in July of 2006, the Trust entered into the Reinsurance Agreement with Maven and transferred $59,995,000 in Trust assets to Maven, which was the insurance premium charged by Maven to reinsure PBT, Ltd. [298], Maven's Add'l Facts 24, 25; [311], Pls.' Resp. to Add'l Facts 25. As of August 1, 2006, Plaintiffs had accumulated an employee beneficial interest in the PBT Trust of $3.38 million. [280], Pls.' Facts 64. The PBT Trust was terminated on October 31, 2006. [298], Maven's Add'l Facts 27. Soon after the termination, General Produce decided that it did not want to establish a single employer plan and did not wish to make further contributions to the plan now administered by Maven. *Id.* at 28. Plaintiffs then purchased an annuity from Acadia Life and instructed Sunderlage to transfer the value of General Produce's account with Maven to the annuity when the coverage period for the Genreal Produce plan expired. *Id.* at 29. Although the PBT Trust Plan called for the direct payment of a termination benefit upon termination of the Trust to the trust beneficiaries in the approximate amount of the beneficiaries' accumulated interest in the Trust, Plaintiffs were required to have Acadia purchase stock issued by Maven to be held by the Acadia annuity. *Id.* at 30; [311], Pls.' Resp. to Add'l Facts 30. Maven was to then declare a dividend for the assets associated with General Produce's account and transfer them to the Acadia annuity. See [298], Maven's Add'l Facts 30.

Between June and July of 2007, it appears that Acadia received assets that were allocated to Plaintiffs' annuity, which purportedly represented the value of General Produce's accumulated

interest in the PBT Trust. First, on June 15, 2007, 3,000 Witherspoon Class A shares were transferred to Acadia Life, which allocated $1.7 million worth of the shares to Plaintiffs' annuity. See [280], Pls.' Facts 73. Plaintiffs contend that the shares were worthless in reality; by September of 2007, Acadia had written down their value to zero. *Id.* at 75. Next, on June 18 2007, the Plaintiffs' Acadia annuity received a payment of $1,072,744. See [298], Maven's Add'l Facts 32. Finally, on July 27, 2007, Maven transferred $1.96 million to Acadia, of which $777,740 was attributed to General Produce. [298], Maven Add'l Facts 36.

**The 2002 and 2004 Loans to Dufferin**

On January 8, 2002, PBT Trust and a company called Dufferin executed a Class A Note for a loan to Dufferin in the amount of $4,417,966 (the "2002 Loan"). [280], Pls.' Facts 1. Dufferin was an offshore company located in Nevis in the Caribbean, and Tracy Sunderlage owned 50 percent of Dufferin. *Id.* at 1, 18. About a week after the note was executed, Sunderlage requested that his ownership in a company called Libera International LLC ("Libera") be transferred to his life insurance policy in anticipation of Libera "receiving income * * * from a Class A Note between Dufferin * * * and [PBT] Trust." See *id.* at 13; see also [273], Ex. 17.

On May 18, 2004, Tracy Sunderlage, as the managing director of Libera, entered into a Placement and Joint Venture Agreement between Libera and Dufferin pursuant to which Libera would provide consulting services to Dufferin in connection with certain transactions and collect a consulting fee equal to 50 percent of Dufferin's net profits. See [276], Ex. 72. The Trust made a second loan to Dufferin soon thereafter in the amount of $3,000,000 (the "2004 Loan"). [280], Pls.' Facts 6.

At some point thereafter, Dufferin indicated that the collateralized debt obligation

("CDO") that had been purchased by Dufferin with the money from at least the 2002 Loan could not be liquidated without extreme devaluation of the CDO.  [280], Pls.' Facts 21.  After the PBT Trust was terminated, Dufferin and PBT Trust executed a Stock Purchase Agreement and Mutual Release pursuant to which Dufferin assigned its shares in Witherspoon CDO Funding and Rosemont CLO to PBT Trust.  See [275], Ex. 66; [280], Pls.' Facts 22.  Tracy Sunderlage signed the agreement as the trustee of the Trust, and as the director of Libera.  *Id.*  Dufferin subsequently transferred its rights to the shares in Witherspoon CDO Funding to Maven's investment manager, B.C. Capital Group International S.A.  [280], Pls.' Facts 23.

**The $2.16 Million Administrative Fee**

Under the PBT Trust, the administrator of the Trust was entitled to a fee of 2% of the value of the entire Trust "[u]pon a sale of the assets of the Trust or upon termination of the Trust."  See [280], Pls.' Facts 80; [273], Ex. 32 at 54.  On January 1, 2006, an amendment to the PBT Trust was executed by Tracy Sunderlage as (1) President of the Professional and Small Business Council, (2) the CEO of PBT, Ltd., and (3) the managing member of PBT Administration, LLC.  [275], Ex. 52.  The Amendment states that "the value of the Trust asset will be either the reinsurance premium paid or the value of the Trust from its last audited financials as of 12/31 of the most recent year end."  *Id.*  Plaintiffs contend that upon termination of the PBT Trust, PBT Administration, of which Tracy Sunderlage was the managing member, received a $2,163,000 administrative fee.  [180], Pls.' Facts 80.

## II.     Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

## III.     Analysis

Plaintiffs bring ten counts in their second amended complaint. Counts I through V are against the Sunderlages, PBT Ltd., and PBT Administration for various violations of ERISA related to (1) the improper termination of the PBT Trust by transfer of the trust assets to Maven (Count I), (2) the loans to Dufferin Capital and Fidelity Insurance (Counts II and III), (3) improper loans from the PBT Trust to trust fiduciaries, (4) and administrative fees and insurance commission (Count V). Counts VI through IX are brought against Linda Sunderlage, Maven, Sunderlage Resource Group, and Sunderlage Resource Group International for aiding and abetting the breaches of fiduciary duties described in Count I. Count X is against PBT, Ltd. and

PBT LLC for a violation of Section 502(a)(1)(A) of ERISA related to the defendants' failure to produce requested documents.

Plaintiffs have moved for partial summary judgment on the issues of liability of (1) the Sunderlages for breaches of their fiduciary duties, (2) Maven as a party in interest in a prohibited transaction with the named plan fiduciaries, PBT Administration and PBT Ltd., for prohibited transactions under the control of the Sunderlages, and (3) SRG Inc. and SRG International for aiding and abetting the breaches of fiduciary duties by Tracy Sunderlage. [281], Pls.' Mem. at 41. Plaintiffs assert breaches of fiduciary duties in connection with five transactions: (1 and 2) the 2002 and 2004 Loans from the PBT Trust to Dufferin, (3) the termination of the PBT Trust, (4) Tracy Sunderlage's conduct in setting up the deal with Maven including the execution of the Reinsurance Agreement between the PBT Trust and Maven, and (5) the award of the $2,163,000 administrative fee when the PBT Trust was terminated.

### A. Statute of Limitations

The Court first addresses the statute of limitations issue raised by Maven in its opposition to Plaintiffs' motion for summary judgment. Plaintiffs contend that the transfer of the PBT Trust assets to Maven was a transaction among interested parties and thus a "prohibited transaction" under 29 U.S.C. § 1106. Maven contends that the Court should deny summary judgment to Plaintiffs with respect to claims arising from the transfer of assets because there is at least a dispute of fact as to whether the claims against Maven are barred by the statute of limitations. Plaintiffs added Maven as a defendant in its second amended complaint on July 21, 2011, see [145], after allegedly learning in discovery that Linda Sunderlage indirectly owned Maven and that Tracy Sunderlage was Maven's director when the PBT Trust assets were transferred to Maven. See [312].

At issue is ERISA's statute of limitations, which provides that:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Maven argues that there is a material issue of disputed fact as to whether Plaintiffs' knowledge about the transfer from the PBT Trust to Maven triggered the three-year statute of limitations by September 2007. Maven further argues that the six-year statute of limitations in cases involving fraud or concealment does not apply here.

The Court first considers whether Plaintiffs filed within the limitations period set forth in 29 U.S.C. § 1113(1) and (2). Under § 1113(1), the parties do not identify the last act or omission in this case, which could be October 31, 2006, when the pension plan was terminated, or July 27, 2007, when Maven transferred assets attributable to General Produce to Acadia. Under § 1113(2), the relevant date is "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." The Plaintiffs joined Maven as a defendant in its second amended complaint on July 21, 2011. Therefore, the Plaintiffs must demonstrate that the earliest date on which they knew of the breach was after July 21, 2008. To have "actual knowledge of the breach or violation," to trigger ERISA's three-year statute of limitations, "a plaintiff must know of the essential facts of the transaction or conduct constituting the violation." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.3d 1078, 1086 (7th Cir. 1992). The limitations period does

not begin to run when a plaintiff comes to learn that "something [is] awry," but the plaintiff need not have "knowledge of every last detail of a transaction, or knowledge of its illegality" to trigger the limitations period. *Id.* (internal quotation marks and citations omitted).

Maven argues that there is a material dispute about when Plaintiffs learned that Linda Sunderlage had an indirect ownership interest in Maven. Plaintiffs contend that they did not learn of the ownership interest until February of 2010 when an Atlanta actuary admitted during his deposition that Linda Sunderlage indirectly owned Maven and that Tracy Sunderlage was the director. See [312], Pls.' Reply at 9 (citing Declarations of David and Therese Mintjal). Maven disputes this fact, pointing to an affidavit by Tracy Sunderlage that states that that Plaintiffs' tax and financial advisors, James Passarelli and Tony Fiorello, attended conferences during which the ownership structure of Maven and Maven's business plan (which specified that Hess Holding Ltd., of which Linda Sunderlage would own 50 percent, would be the registered owner of Maven) were discussed. [300], Maven's Mem. at 10. Plaintiffs dispute that their advisors were made aware of the ownership structure, and have provided declarations from the advisors in support. See [311], Pls.' Resp. to Maven's Add'l Facts, Exs. 120, 121. Maven further contends that Plaintiffs were aware that Tracy Sunderlage was "behind Maven." [300], Maven's Mem. at 10 (citing D. Mintjal Tr. 154). The record therefore contains a material dispute about what the Mintjals knew about Maven and its relationship to the Sunderlages.

However, Plaintiffs rightly contend that Tracy Sunderlage affirmatively misrepresented the ownership of Maven to the PBT Trust employer participants, thereby triggering the six-year statute of limitations that applies "in the case of fraud or concealment." 29 U.S.C. § 1113. The Seventh Circuit has determined that the phrase "in the case of fraud or concealment" "refers to steps taken by the defendant to hide the fact of the breach rather than to the underlying nature of

plaintiffs' claim." *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990). "[T]he Plaintiffs must first show that fraud or concealment actually occurred," either through the fiduciary's "misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary does not becomes aware of them (concealment)." *Laskin v. Siegel*, 728 F.3d 731, 735 (7th Cir. 2013) (citing *Radiology Ctr., S.C.*, 919 F.2d at 1220). Thus, the Plaintiffs need to point to something undisputed in the record that demonstrates that the Sunderlages or Maven took steps to mislead or conceal the relevant transactions.

Maven incorrectly characterizes what is required for a case involving fraud under § 1113. While it is true that "a finding of concealment requires evidence that a defendant took affirmative steps to hide the violation itself, the six-year statute of limitations contemplates not one type of fraud, but two: "(1) overt acts that misrepresent the significance of facts of which the beneficiary is aware; and (2) underlying ERISA violations that are self-concealing." *Laskin*, 728 F.3d at 735. Plaintiffs point to a letter dated October 3, 2006, in which Tracy Sunderlage and his son Carey announced to the plan participants that PBT Trust had entered into an agreement with "Maven Assurance Ltd., the captive insurance company which is owned by the employers." [311], Ex. 119 at 2. The Plaintiffs learned in the course of discovery that Maven was not a captive insurance company, but in fact a company owned by Hess Holdings, 50% of which was, in turn, owned by Linda Sunderlage. [275], Ex. 41 at 6. Thus, the Plaintiffs have demonstrated a misrepresentation by the Sunderlages that the Plaintiffs only learned of in February 2010, thus bringing their lawsuit within the six-year statute of limitations under the fraud exception to § 1113.

### B.     Whether the Plaintiffs Lack Standing

Maven also argues that the Plaintiffs cannot sue under ERISA because the PBT plan terminated in 2006 and expired in January 2007. Yet, the Seventh Circuit has explained why that "overly technical and narrow reading * * * would lead to the result that no former employee could bring an ERISA claim for welfare benefits allegedly accrued during employment." *Panaras v. Liquid Carbonic Indus. Corp.,* 74 F.3d 786, 791 (7th Cir. 1996) (internal quotation marks and citation omitted). Rather, "standing is available to any former employee who has a colorable claim to benefits which the employer promised to provide pursuant to the employment relationship and which a non-frivolous argument suggests have accrued to the employee's benefit." *Id.* This Court already decided that the Plaintiffs had a colorable claim for vested benefits when it denied the Sunderlages' Motion to Dismiss, [65] at 6-8, and that reasoning need not be rehashed here. See, *e.g.*, *Vallone v. CAN Fin. Corp.*, 375 F.3d 623, 640 (7th Cir. 2004).

### C.     Whether the Sunderlages Breached their Fiduciary Duties

The Court now addresses whether the Sunderlages breached their fiduciary duties under ERISA.  As a threshold matter, the Court must first determine whether the Sunderlages are fiduciaries under the statute.  Under 29 U.S.C. § 1002(21), a person is a fiduciary with respect to a plan if he: (1) exercises any discretionary authority or discretionary control respecting management of such plan, or exercises any authority or control respecting management or disposition of the plan's assets; (2) renders investment advice with respect to any moneys or other property of the plan for a fee or other compensation; or (3) has any discretionary authority or discretionary responsibility in the administration of the plan.  The fiduciaries of a plan may include the plan's trustees, administrators, or investment committee members.  While Tracy Sunderlage is not named in the trust agreement, he exercised discretionary control over the management of the plan and its assets.  See *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir.

2009). Accordingly, Tracy Sunderlage is a fiduciary under § 1002(21). He owned 100% of the named plan trustee, PBT Ltd. and 90% of the named trust administrator, PBT Administration LLC. He also signed the requisite 5500 forms (the "Annual Return/Report of Employee Benefit Plan" forms) with the I.R.S. and the Department of Labor as the Plan Administrator for the years 2001 through 2006. See [276], Exs. 84-89. Finally, Tracy Sunderlage admits that he was the CEO and Corporate Trustee of PBT, Ltd. in his Rule 56.1 Statement of Material Facts. [294] at 5.

The Plaintiffs also believe that they are entitled to summary judgment on the issue of whether Linda Sunderlage is a fiduciary. They have not met their burden on this issue. The record lacks evidence that Linda Sunderlage had any discretionary authority or discretionary responsibility in the administration of the plan. The only piece of evidence that Plaintiffs offer to this effect is that she transferred the 2004 loan from PBT Trust to Dufferin in April 2004. [277], Ex. 91. While the record contains a document showing Linda Sunderlage's signature on behalf of PBT, that does not show that she is (or was) a fiduciary with respect to the plan. [277], Ex. 91. A reasonable factfinder could conclude that such a document does not mean that Linda Sunderlage had discretionary authority or discretionary responsibility in the administration of the plan or its assets. See [294], Sunderlages' Response 11. There is a genuine dispute of material fact as to whether Linda Sunderlage had any discretionary authority or responsibility over the plan and accordingly whether she is a fiduciary under ERISA.

Nonetheless, having determined that Tracy Sunderlage is a fiduciary within the meaning of 29 U.S.C. § 1002(21), the Court now proceeds to determine whether Tracy Sunderlage breached his fiduciary duties in regards to the five actions pleaded by the Plaintiffs in their Second Amended Complaint and for which they now seek summary judgment.

### 1.       The 2002 and 2004 Loans from PBT Trust to Dufferin

The primary responsibility of a fiduciary is to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). In doing so, the fiduciary is required to fulfill his duties "with the care, skill, prudence, and diligence [of] a prudent man," and "diversify[] the investments of the plan so as to minimize the risk of large losses." *Id.* § 1104(a)(1)(B)–(C). In interpreting ERISA, the Supreme Court has explained that the common law of trusts "charges fiduciaries with a duty of loyalty to guarantee beneficiaries' interests: 'The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty.'" *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quoting 2 SCOTT & FRATCHER, TRUSTS § 170, p. 311 (4th ed. 1987)).

Accordingly, the fiduciary cannot engage in certain "prohibited transactions" under 29 U.S.C. § 1106. A fiduciary is prohibited from *knowingly* engaging in a transaction between the plan and a party of interest that constitutes: (1) a sale, exchange, or leasing of any property, (2) the lending of money or other extension of credit, (3) the furnishing of goods, services, or facilities between the plan and a party in interest, (4) the transfer or use of any assets of the plan by the party in interest, or (5) the acquisition of any employer security or employer real property. 29 U.S.C. § 1106(a). The term "party in interest" includes "any fiduciary including, but not limited to any administrator, officer, trustee, or custodian), counsel or employee of such employee benefit plan," "a person providing services to such plan," "a relative" of any of the above, or any "corporation, partnership, or trust or estate of which (or in which) 50 percent or more" of the voting power of all classes of stock. 29 U.S.C. § 1002(14). In addition, a fiduciary may not deal with the assets of the plan in his own interest or receive any personal consideration from a third party for any transaction involving the plan. 29 U.S.C. § 1106(b)(1), (3).

While acting as a fiduciary for the beneficiaries of the PBT Trust, including the Plaintiffs, Tracy Sunderlage engaged in prohibited transactions when he transferred the plan's assets to Dufferin Capital Ltd. Sunderlage admitted that he was 50% owner of Dufferin Capital as of September 27, 2006. [275] Ex. 56. However, the notes in question date from January 8, 2002 and May 18, 2004, respectively. [280], Pls.' Facts 1, 6. The Plaintiffs contend that this obfuscation was intentional on the part of the Sunderlages and point to Elaine Vorberg's letter to Harry Wiggin as evidence that Tracy Sunderlage owned Dufferin at the time of the 2002 and 2004 notes. However, in that letter, Vorberg writes that "at the time Dufferin Capital, Ltd. was formed, Fidelity Insurance Company policy f/b/o Tracy Sunderlage owned Libera" and that "Libera, along with Westminster Hope and Turnberry, Ltd. ('WHT') formed Dufferin, but that she lacks "any documentation to confirm this fact, or to further describe the formation of Dufferin." [273] Ex. 18 at 1.

Importantly, while Maven does not dispute Plaintiffs' assertion that Tracy Sunderlage owned half of Dufferin, [298], Maven's Resp. to Facts 18, the Sunderlages do dispute their ownership in Dufferin, writing that Tracy Sunderlage "in fact never had ownership in [the company] and no documents exist to provide ownership." [294], Sunderlages' Resp. to Facts 18. One of the documents that Plaintiffs cite in support of this fact is a September 2006 letter signed by Tracy Sunderlage as a "Member" of Dufferin through Libera International LLC ("Libera"). [275], Ex. 56. In the letter, Sunderlage writes, "I am a 50% owner of Dufferin Capital Limited." *Id.* The Sunderlages do not contest the veracity of the letter; they only state that an insurance policy in which Sunderlage had an interest owned Libera, which was a consultant to Dufferin. The Sunderlages do not point to any evidence in the record supporting their denial of Plaintiffs' proposed undisputed fact. Because the Sunderlages have not provided a proper denial, and have

not otherwise explained why Plaintiffs' evidence should not be accepted on this point, the Court deems this fact admitted for purposes of ruling on Plaintiffs' motion for summary judgment.

29 U.S.C. § 1106(a)(1)(B) prohibits loans between a fiduciary and a "party in interest." Tracy Sunderlage, as the managing director of Libera, entered into a Placement and Joint Venture Agreement between Libera and Dufferin pursuant to which Libera would provide consulting services to Dufferin in connection with certain transactions and collect a consulting fee equal to 50 percent of Dufferin's net profits. See [276], Ex. 72. The Trust made a second loan to Dufferin soon thereafter in the amount of $3,000,000 (the "2004 Loan"). [280], Pls.' Facts 6. However, although Tracy Sunderlage had 50% ownership in Dufferin, Plaintiffs cannot point to evidence in the record demonstrating that the prohibited transaction took place. The Sunderlages rightly point out that Placement and Joint Venture Agreement is not signed by Charles D'Angelo, listed as President of Dufferin. *Id.* at 3. Nor can the Plaintiffs show that the 2004 Loan was in force as they point to yet another unsigned document. [275], Ex. 55. Because the Court cannot find evidence in the record of the 2002 and 2004 transactions between the plan and Dufferin, the Plaintiffs have not carried their burden to merit summary judgment on this issue.

### 2. The Sunderlages' Roles in Maven and the Reinsurance Agreement

Plaintiffs also maintain that they are entitled to summary judgment on the issue that Tracy Sunderlage engaged in prohibited transactions when he transferred assets from PBT to Maven Assurance. To assess this claim, this Court must first determine whether Maven Assurance is a party of interest. Maven is a party of interest both because of Tracy Sunderlage's involvement as a corporate officer and because of Linda Sunderlage's 50% ownership interest. The Sunderlages do not dispute that Tracy Sunderlage was a member of the Board of Directors

of Maven from its inception on April 24, 2006 until October 4, 2006. See [294], Sunderlages' Response 82; [280], Pls.' Facts 82. Maven also admits that that Plaintiffs were aware that Tracy Sunderlage was "behind Maven." [300], Maven's Mem. at 10 (citing D. Mintjal Tr. 154). Tracy Sunderlage was prohibited from engineering a transfer of assets from PBT to Maven given his personal stake in the latter. When the Trust entered into the Reinsurance Agreement with Maven in July of 2006, the Trust transferred $59,995,000 in assets to Maven, which was the insurance premium charged by Maven to reinsure PBT, Ltd. [298], Maven's Add'l Facts 24, 25; [311], Pls.' Resp. to Add'l Facts 25. Tracy Sunderlage was a member of the Board of Directors of Maven during that time. [280], Pls.' Facts 82. It necessarily follows that, considering Maven was a prohibited party of interest, the Reinsurance Agreement between PBT Trust and Maven also was a prohibited transaction under 29 U.S.C. § 1106.

Furthermore, relatives of the fiduciary qualify as "a party in interest," thus prohibiting the fiduciary from engaging in various transactions with a "spouse, ancestor, lineal descendant, or spouse of a lineal descendant." 29 U.S.C. § 1002(15). In an attempt to support its statute of limitations argument, discussed above, Maven admits that its business plan specified that Hess Holding Ltd., of which Linda Sunderlage would own 50 percent, would be the registered owner of Maven. [300], Maven's Mem. at 10. Therefore, the Maven transfer was also prohibited by 29 U.S.C. § 1106(a)(1)(D) given Linda Sunderlage's status as a "party in interest." At the time of that Reinsurance Agreement, Tracy Sunderlage and his wife Linda Sunderlage were prohibited parties in interest through their relationship to Maven. Accordingly, Tracy Sunderlage engaged in a prohibited transfer of assets of the plan to Maven, a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

Furthermore, even if Linda Sunderlage had not owned 50% of Maven and Tracy Sunderlage was not a corporate officer of Maven, Tracy Sunderlage breached his fiduciary duty to the PBT Trust when he transferred the Trust assets to Maven Assurance Ltd. in Anguilla. ERISA prohibits a fiduciary from "maintain[ing] the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States." 29 U.S.C. § 1104(b).

### 3. Termination of the PBT Trust

Upon termination of a welfare plan, the assets of the plan should be allocated "in accordance with the terms of the plan, except as otherwise provided by federal regulations. 29 U.S.C. § 1103(d)(2). "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) (citing *Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 947 (6th Cir. 1990) ("[A] company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan")) (other citations omitted).

Since the mere termination of a welfare plan is not typically evidence of a fiduciary's breach, the Plaintiffs must demonstrate that the termination of the PBT Trust was not accomplished in accordance with the terms of the plan. While the plan does not mention a conversion of the Trust's assets into a company like Maven or through an insurance premium, neither does it explicitly prohibit such a conversion. The plan does contain mandatory language that in the event of the plan's termination the Contract Administrator must "issue Termination Distributions to the Participating Employees." [273], Ex. 32 at 45. The Sunderlages and Maven admit that the plan went into effect on October 1, 2002 and remained in effect for the duration of

the PBT Trust.  [294] at 28; [298] at 28.  The plan defines "Termination Distributions" as "the payment to a Participant Employee of an Employee Group of that Employee's share of the Employee Group's Beneficial Interest of the Trust Fund upon termination of the entire welfare benefit Plan" after payment of benefits due under the plan as well as fees, costs, excess claims, and taxes.  [273], Ex. 32, at 15.  The PBT Trust sent all plan participants a letter informing them not of the plan's termination, but that Maven would be the new administrator of the plan.  The PBT Trust gave the beneficiaries three options: 1) continue participating in the multi-employer plan with Maven as the new administrator, 2) continue participating with another insurance company overseeing their beneficial interest, or 3) opt out of the plan altogether and transfer their beneficial interest to a single-employer plan by December 21, 2005.  Yet, no amount of inferences in favor of the nonmovant can create a dispute of material fact as to whether or not the Trust was terminated or simply had a new administrator as the Sunderlages maintain.  The Sunderlages and Maven at various points in their responses to the Plaintiffs' Statement of Material Facts admit that the Trust was terminated.  By transferring the Plaintiffs' assets into Maven, Tracy Sunderlage failed to terminate the Trust in accordance with the Plan.

### 4.     The $2,163,000 Administrative Fee

Plan assets may only be expended to pay benefits to participants and beneficiaries and to defray the reasonable expenses of administering the plan.  29 U.S.C. § 1104(a)(1)(A).  In making determinations concerning plan expenses a fiduciary must discharge his duties "solely in the interest of participants and beneficiaries."  *Id.*  A plan fiduciary may receive reasonable compensation from a plan for services rendered to the plan as well as reimbursement for reasonable "direct expenses" properly and actually incurred in the performance of his duties with the plan and not otherwise reimbursed.  29 U.S.C. § 1108(c)(2).  However, such compensation

cannot occur if the fiduciary "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). A fiduciary should not involve himself in the determination his own compensation. A plan administrator must not establish his own compensation or take part in the compensation decision because doing so would violate § 1106(b) even though the payment of the compensation may be permitted under ERISA.

The Sunderlages point out that the plan entitled the plan administrator to "a fee of 2% per year of service rendered, not to exceed 30% of the value of the assets in the Surplus Account." [294] at 80 (quoting Section 14.16 of the Fifth Amended Trust Document). However, the fiduciary can only claim that administrative fee after paying out to the beneficiaries. Furthermore, Tracy Sunderlage failed to disclose how he arrived at the amount of $2.16 million as his administrative fee at the time of the Trust's termination. In the Sunderlages' Rule 56.1 Statement, they mention that "[t]he termination fee was based on the last valuation of the Trust which was 12/31/2005." The Sunderlages insist that some assets of the Trust would "not be appropriate assets to transfer under the Reinsurance Agreement" in part because "U.S. gas and oil partnerships can not [sic] be owned by non-US company's or foreign citizens." Regardless of whether or not that is true, Tracy Sunderlage as the plan Administrator breached his fiduciary duty in amending the Fifth Amended Trust Document in order to change his compensation scheme. Tracy Sunderlage signed two resolutions on October 4, 2006 changing the plan to apply the 2% multiplier to the entire value of the Trust at the end of 2005 instead of the plan's original language "upon termination." The Court does not base its ruling on this issue on the ground that the $2,163,000 fee was plainly excessive, as there is little in the record that suggests what would be a reasonable fee. Rather, it is clear that in deciding his own administrative fee, Tracy

Sunderlage impermissibly determined his compensation for administering the fund as opposed to applying the formula laid out in the plan itself.

**D.      SRG Inc. and SRG International for Aiding and Abetting**

Finally, the Plaintiffs seek summary judgment on the issue of whether PBT Administration and PBT Ltd. are liable for aiding and abetting Tracy Sunderlage's fiduciary breach to the Plaintiffs. Liability of a non-fiduciary for aiding a fiduciary breach "require[s] more than innocent but careless errors on the part of the non-fiduciary defendant." *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 542 (7th Cir.1991). A non-fiduciary is not completely insulated from liability, however. A "transferee of ill-gotten trust assets may be held liable * * * only when the transferee (assuming he has purchased for value) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

Thus, Plaintiffs must demonstrate not only a fiduciary breach—which they have done with the Maven transaction—but also that the non-fiduciary *knowingly* participated in that prohibited conduct. See *Daniels*, 313 F. Supp. 2d at 808. The Plaintiffs demonstrate that SRG International collected millions of dollars in commissions from Maven starting at the time of the termination of the trust. [277], Ex. 101. The Plaintiffs also demonstrate that SRG International then transferred those commissions to SRG Inc. The Sunderlages dispute Plaintiffs' characterization of SRG International's "offshore income," *compare* [280] at 51 *with* [294] at 51, and also dispute that SRG International received insurance commissions from Maven Assurance through SRG. However, Tracy Sunderlage admitted in his February 8, 2011 deposition that SRG International received "commissions and trail fees" from Maven. [277], Ex. 104 at 91. Tracy

Sunderlage also admitted that he owned 51% of SRG, and that Linda Sunderlage owned the other 49%. *Id.* at 95. Accordingly, the Sunderlages' ownership of SRG Inc. and SRG International must have provided, at the very least, constructive knowledge of these transactions. The Court concludes the Plaintiffs have carried their burden on this issue by demonstrating that SRG Inc. and SRG International had "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust*, 530 U.S. at 251.

## IV. Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion [281] on the issues of (1) liability against the Sunderlages for breaches of their fiduciary duties with regard to the transactions with Maven, (2) Maven's liability as a party in interest in prohibited transactions with the named plan fiduciaries PBT Administration and PBT Ltd., (3) the termination of the PBT Trust, (4) the award of the $2,163,000 administrative fee when the PBT Trust was terminated, and (5) SRG Inc.'s liability and SRG International's liability for aiding and abetting the breaches of fiduciary duties by Tracy Sunderlage. The Court denies Plaintiffs' motion as to the 2002 and 2004 Loans from the PBT Trust to Dufferin. The case is set for a status hearing on October 22, 2015 in order to determine how the parties wish to proceed with the remaining claims.

Dated: September 29, 2015

Robert M. Dow, Jr.
United States District Judge